THYS CO. et al. v. OESTE.

No. 6435.

United States District Court
N. D. California, N. D.

Feb. 25, 1953.

Townsend, Townsend & Hoppe, San Francisco, Cal., for plaintiff.

C. K. Curtright, Sacramento, Cal., White & White, San Francisco, Cal., for defendant.

LEMMON, District Judge.

Ecclesiastes tells us that men "have sought out many inventions". Consequently—to paraphrase the same Preacher—of making many patents there is no end.

Frequently, however, patents have been improvidently granted. In the words of Mr. Justice Douglas, "The Patent Office, like most administrative agencies, has looked with favor on the opportunity which the exercise of discretion affords to expand its own jurisdiction. And so it has placed a host of gadgets under the armour of patents—gadgets that obviously have had no place in the constitutional scheme of advancing scientific knowledge." [1]

Of such a jejune type is the patent in suit.

1. *The Complaint*

The complaint was filed on December 15, 1950. It alleged that on December 24, 1940, United States Letters Patent No. 2,226,009 were issued to the plaintiff Horst Company "for an invention in Hop Separator", and that the Horst Company is still the owner of the patent. Other allegations were:

On October 18, 1940, Edouard Thys entered into an exclusive license agreement with the Horst Company, whereby Thys became the exclusive licensee under "certain United States and foreign Letters Patent and applications, including Application * * * Ser. No. 299,986, for Hop Separator, filed June 20, 1940, and which said application matured" as the patent in suit, No. 2,226,009, hereinafter referred to as "the patent".

On or about December 30, 1946, Thys assigned his title to the agreement to the

1. Concurring opinion in Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 1950, 340 U.S. 147, 156, 71 S.Ct. 127, 132, 95 L.Ed. 162.

plaintiff **Thys Company**, and the plaintiff Horst Company consented to the assignment on or about January 24, 1947, since which latter date the Thys Company has been the exclusive licensee under the patent.

The defendant has been infringing the patent "for a long time last past" and will continue to do so unless enjoined by this Court. The plaintiff Thys Company has placed the required statutory notice on all Hop Separators manufactured, "and/or leased, and/or sold by it" under the patent, and has given written notice to the defendant of her infringement.

The complaint closes with a demand for a preliminary and final injunction, for an accounting for profits and damages, a sum equal to three times the amount of actual damages, etc.

### 2. The Answer

After divers proceedings not here relevant, on April 17, 1951, the defendant filed her answer. She denied the validity of the patent, on the ground that more than two years prior to the date of the application therefor, "the said alleged improvements, or all material and substantial parts thereof, had been patented or described in printed publications". The answer lists sixteen prior domestic patents and one foreign patent, and also asserts prior public use or offer for sale of the "alleged improvements" by the patentees and assignees of the seventeen patents, and by others.

It is also averred that the alleged improvements or inventions "purported to be covered" by the patent were devoid of substantial novelty or invention because of the prior art, as shown by printed publications or patents, "the prior use and knowledge by others," etc., "particular(ly) with respect to pervious separator belts, alone, as well as in combination therewith of delivery and take-off conveyors," etc. The defendant asserts that the claims define "unpatentable aggregations as distinguished from patentable combinations".

The answer further alleges that the patent describes and claims "only old and familiar means in common knowledge and use long prior to the alleged invention thereof by * * * George E. Miller (the assignor of the patent to the Horst Company), which were within the reach of and at the disposal of any person skilled in the art," etc.

File wrapper estoppel is also pleaded, and infringement is denied.

On April 22, 1952, the defendant filed a "Notice of Additional Defenses", listing five additional patents "as evidence of previous invention, knowledge, or use of the thing patented," etc.

### 3. The Motion to Dismiss

At the close of the plaintiffs' case in chief, the defendant made an oral motion to dismiss, on the grounds that "the disclosure of this patent is indefinite, incomplete, not clear, and not in accordance or in conformity with Revised Statute(s) 4888 or 35 U.S. C.A. § 33". The Court deferred a ruling on the motion until the conclusion of the case.

Since the Court is disposing of this litigation on a broader ground, a ruling on the motion to dismiss is not necessary.

### 4. The Patent

Three claims are contained in the patent in suit. They are set out in the margin.[2]

2. "1. In a machine for separating hops from leaves, stems and other foreign material, a pair of spaced endless sprocket chains, upper and lower pairs of sprocket gears to support the chains, cross-bars connecting the chains, a pervious separator belt composed of netting material woven from textile cords supported by the cross-bars, cross-slats disposed on top of the netting material and securing said material to the cross-bars, said net and the chains supporting the same being disposed on an incline, means for imparting continuous movement to the belt in a direction to cause it to travel up the incline, means for maintaining a continuous flow of air through the netting material, and means for depositing hops, leaves and stems on the netting material at a point adjacent the upper end, the mesh in said netting material being slightly smaller than the hops to be separated, to permit the hops to roll down the inclined surface presented by the netting material, the mesh in said netting, and the cross-slats, retaining the leaves and large stems but permitting smaller stems to fall through the mesh of the netting material.

"2. In a machine for separating hops

At the outset, it may be well to consider some generalizations indulged in by the plaintiffs with regard to their patent.

In the first place, they assert that the "citation of so many prior art patents (supra) in and of itself, is evidence that there is no substance to Mrs. Oeste's argument that Miller (sic) combination did not require invention". This seems to be a non sequitur on the plaintiffs' part; for the classical purpose of citing prior art is to show lack of invention in the patent in suit. If the prior art cited is not relevant, a criticism of this type might be appropriate; but the mere citation of earlier patents is not, "in and of itself", evidence of any weakness in an alleged infringer's argument.

Furthermore, in describing their machine, the plaintiffs indulge in considerable hyperbole. It is scarcely appropriate to refer to what is admittedly a "combination patent"—even were it meritorious—as representing "a high degree of invention". Similarly, this Court cannot agree that "this is one of the few cases which has (sic) come before this Court in which the patent in suit could be said to meet all of the affirmative tests of invention which have been announced by the Courts". Nor is there factual justification in the record for the statement that "The Miller Combination Has Produced *Surprising* New Results".

Again, some of the assertions contained in the testimony adduced by the plaintiffs are palpably immoderate—such as the statement by the witness Wisseman that comparing his "original" machine with the "fishnet separator" of the patent in suit "would be somewhat like comparing a wheelbarrow to a Cadillac"!

Finally, somewhat intemperate is counsel's criticism of William A. Doble, the defendant's expert witness. When Mr. Doble took the stand, one of the attorneys for the plaintiffs stipulated to his qualifications "absolutely", declaring that "there is no question about qualifying Mr. Doble as an expert witness". Yet in their reply brief counsel assert that "The Defendant's Expert Is Not Credible" that his "*capacity* and *experience* is (sic) that of an advocate on the stand rather than that of a fact witness"; and that "His testimony is entitled to no more weight than the argument of counsel". (Emphasis supplied.) The Court does not believe that these strictures upon Mr. Doble's "capacity" and "experience" are warranted.

### Each Component of the Combination Is Old

The elements of this combination patent are old. The plaintiffs do not only admit

from leaves, stems and other foreign material, a pair of spaced endless sprocket chains, upper and lower pairs of sprocket gears to support the chains, cross-bars connecting the chains, a pervious separator belt composed of netting material woven from textile cords supported by the cross-bars, knots formed at the points where the cords intersect each other to form the meshes of the netting material, cross-slats disposed on top of the netting material and securing said material to the cross-bars, said net and the chains supporting the same being disposed on an incline, means for imparting continuous movement to the belt in a direction to cause it to travel up the incline, means for maintaining a continuous flow of air through the netting material, and means for depositing hops, leaves and stems on the netting material at a point adjacent the upper end, the mesh in said netting material being slightly smaller than the hops to be separated, to permit the hops to roll down the inclined surface presented by the netting material, the mesh in said netting, the knots formed at the intersection of the meshes, and the cross-slats, retaining the leaves and large stems but permitting smaller stems to fall through the mesh of the netting material.

"3. In a machine for separating picked hops from leaves, stems and other foreign material, a pervious separator belt composed of textile netting material having a diamond-shaped mesh slightly smaller than the size of the hops to be separated, means for disposing the belt on a sufficiently steep incline to cause hops deposited on the surface of the belt adjacent the upper end thereof to roll down the incline and off the belt, means for imparting continuous movement to the belt in a direction opposite to the rolling hops, and means for maintaining a continuous flow of air through the belt with sufficient velocity to cause leaves and the like to adhere thereto."

this: they insist upon it. For example, their counsel declared—somewhat tautologically perhaps—that every element of the patent was "old and ancient", or "infinitely old". Indeed, counsel tried to lead Doble to say that the fishnet was used in ancient days—yea, verily, even unto "Biblical times". So vehement, as a matter of fact, has been the emphasis upon the almost paleozoic antiquity of this implement, that a reader of the record would be only mildly surprised to learn of a fishnet buried in the primordial ooze—dropped there by a discouraged Pithecanthropus!

Despite these emphatic disclaimers of any novelty inherent in a fishnet, however, Miller, the assignor of the patent in suit, insisted on the stand "that a belt made of netting—a pervious belt of netting had never been used before and is entirely new." Miller added:

"The material used in manufacturing this belt is old, of course, but the formation of it into a separating belt was an entirely new idea, had never been used, and proved successful."

Elsewhere in his testimony, Miller repeated that assertion. He testified that the only difference in his patent is that the "inclined plane" is built of "different material"; and that "the mesh constructed for the separating purposes"—"that is the invention".

Nevertheless, in the specifications that form part of the patent, Miller stated:

"While good results have been obtained with netting material made both from wire and from textile cord, that is, cord similar to so-called 'fish line', or that used in the manufacture of fish nets, the fish-net type of pervious belt seems to give the best results; and while this and other features of my invention have been described and illustrated in more or less specific form, I nevertheless wish it understood that changes may be resorted to within the scope of the appended claims." (Page 3, col. 1, lines 20–30 of the patent)

On cross-examination, when Miller was questioned regarding the concession in the patent that "good results have been ob- tained with netting material made both from wire and from textile cord", he pointed out that he "didn't patent the metal belt", but "The fishnet belt".

While it is true that the claims themselves specify that the separator belt shall be made of textile netting material, the concession in the specifications that "good results have been obtained" with wire netting throws some light upon the plaintiffs' extravagant claims of "surprising new results".

Claim 2 of the patent differs from the other two claims in that it calls for "knots formed at the points where the cords intersect each other to form the meshes of the netting material," etc. Doble testified that "The knots projecting above the net would tend to cause material to adhere to the surface of the net," but that this is "obvious" and "Inherent in the fishnet itself".

### 5. *The Parade of Prior Patents*

The mesh of the separator belt, then, is the claimed "invention".

Let us see just how much patentable novelty the plaintiffs have caught in their fishnet. A glance at the prior art gives the answer.

### (a) *Scott, No. 1,107,207, August 11, 1914*

The device was designed for hulling peas and beans. There was specified "a special screening surface for the body of the *separating drum* 24. This consists of a pliable netting of fibrous strands such as the cord netting, shown in Fig. 5. I may make use of an ordinary *seine* or *fish net,* but in order to make use of a heavier thread I prefer to make a *net* by using large sized cord crossed at suitable intervals to form the correct size of opening and staple the cords together instead of *knotting* them." (Emphasis supplied.)

Miller admitted that fishnets have knots at the intersections of the cords to form the meshes, but added, not very luminously, "they are just knots because they happen to be there".

Doble testified that the pervious separating belt shown in Scott performs the same function in the Miller patent that it does in the Scott patent.

*(b) Horst, No. 1, 488,249, March 25, 1924*

This patent teaches an "incline or surface down which the hops are permitted to roll during the separating operation" and overlapping slats 7 that "may be covered with canvas or the like to present a roughened or adhesive surface for the leaves, petals, etc., to be .collected thereon".

This Horst patent was declared invalid by this Court in E. Clemens Horst Co. v. Gibbens & Blodgett, D.C.Cal.1943, 50 F. Supp. 607, 608. Language used in that case is apposite here:

"The claim of the separator patent is, in my opinion, invalid for want of novelty and invention in view of the state of the art at the time of the issuance of the [patent], as disclosed by the teachings and drawings of the expired patent to Horst, #1,054,119, * * *.

"If invention were to be found in that part of the combination claim of the separator . patent relating to the structure of the separating belt, the patent would still be invalid as claiming [as here] more than the patentee invented. The claim of the separator patent did not cover the separating belt alone. The separating belt was one of a combination of elements none of which performed any new or different function in the claimed combination over that performed by these same elements as shown in combination in the expired patent to Horst, #1,054,119. I consider the principle of Lincoln Engineering Co. of Illinois v. Stewart-Warner Corporation, 303 U.S. 545, 58 S.Ct. 662, 82 L.Ed. 1008, controlling here." (Emphasis supplied.)

*(c) Thompson, No. 1,583,201, May 4, 1926*

This patent was for grading fruits, vegetables, coal, ores, and the like. In the specifications, it was described as used for grading potatoes. The machine contained *two* endless "sorting chains", each having a different-sized mesh from the other. A hopper directed the potatoes upon the first sorting chain. The potatoes, called "seconds", that passed through the chain of "larger mesh" were conveyed to the second sorting chain, of smaller mesh. The potatoes that were retained on the first, or larger-meshed chain, were conveyed into a bag. In other words, the larger-meshed chain retained the larger potatoes, and the smaller-meshed chain, the smaller potatoes. "The very small potatoes of no commercial value and the dirt and clods pass through the second sorting chain 25 to the ground."

The Thompson patent and the Scott patent, supra, both figured in the disallowance of two of Miller's .claims in the Patent Office. These file-wrapper matters will be discussed infra.

*(d) Hoffeld, No. 2,115,107, April 26, 1938*

Along with the Thys patent, infra, this Hoffeld disclosure is the "closest representation" of the plaintiffs' device, according to Doble.

This invention is of an apparatus for the silking and the cleaning of corn. Its teaching includes a "screen" or "open mesh" "conveyor member" supported on sprockets.

Regarding this "separator belt", Doble explained:

"That is not a textile belt in the sense that it is not a fishnet; it is made of metallic strips, but it serves the same function, to .separate the kernels of the corn from small pieces of the cob and the silk of the corn."

Testifying with regard to Claim 3 of the patent in suit, which, inter alia, provides "for disposing the belt on a sufficiently steep incline to cause hops deposited on the surface of the belt adjacent the upper end thereof to roll down the incline and off the belt," the defendant's expert continued, referring to Hoffeld's "conveyor member":

"Yes, it performs the same function exactly. As shown in Fig 5, the elements to be separated are deposited from a hopper to the upper end of the inclined belt 3 and the corn which is to be saved rolls down the belt and is finally received in the hopper below the lower end of the belt, while the corn silk, corn husk parts and other

foreign material are conveyed upwardly by the belt over the top pulley and deposited to the rear of the conveyor or separator belt."

*(e) Thys, No. 2,138,529, November 29, 1938*

Like the patent in suit, the Thys device is a "hop separator". He, too, teaches "an endless pervious belt disposed at an inclination". "This belt," Thys says in his specifications, "may be constructed of a coarse fabric, or a comparatively closely woven wire, or like material".

Testifying in the present suit, Thys said that Fig. 2 of his patent, which is an enlarged perspective view of a portion of the separator belt, showed a *wire* mesh. Under further questioning, however, he admitted that the figure "possibly could" show a "coarse fabric belt", but added that such a belt was not what he "had in mind".

Thys finally admitted that, in his patent, he was attempting to claim both a wire belt similar to Fig. 2 shown therein, and a coarse fabric belt similar to that same figure. As a matter of fact, there is no limitation anywhere in Thys's claims that the pervious belt shall be of "closely woven wire".

Fig. 1 of the Thys patent, which shows "a central, vertical section of the separating machine", is, to use an expression of which plaintiffs' counsel seems fond, almost a "Chinese copy" of Fig. 1 of the patent in suit.

Finally, Miller admitted that the netting material in this Thys patent performs the identical function that the mesh performs in the patent in suit.

*(f) Wardell, No. 1,480,354, January 8, 1924*

The patent in suit points out that "the fabric cord from which the net is woven presents a nap-like surface", and helps further to increase "the tendency for leaves, petals and stems to adhere to the surface of the netting".

Disclosing an apparatus for removing dust from roofing grit, Wardell shows a hopper delivering material to the upward-moving surface of a "belt 10 * * * preferably surfaced with a layer 31 of material having a pronounced nap, such as carpeting or cocoa matting or a specially constructed fabric of a brushlike character. The dust will thus be received into the nap and thereby be carried upwardly away from the granular material."

### 6. The Disallowed Claims

The file wrapper shows that Miller's original claims 1 and 2 were rejected by the Patent Office. Those claims read as follows:

"1. In a machine for separating picked hops from leaves, stems and other foreign material, a pervious separator belt composed of textile netting material having a diamond-shaped mesh slightly smaller than the size of the hops to be separated.

"2. In a machine for separating picked hops from leaves, stems and other foreign material, a pervious separator belt composed of netting material formed from textile cords and having a mesh slightly smaller than the size of the hops to be separated, and knots formed at the points where the cords intersect each other to form the meshes of the netting material."

On February 8, 1940 the Examiner in the Patent Office wrote to the attorney for the plaintiffs in part as follows:

"Claims 1 and 2 are rejected as unpatentable over Thompson in view of Scott (supra). It would not in view of Scott, constitute invention to make Thompson's screen of fish net or similar material."

On June 5, 1940, the Patent Office wrote as follows:

"Claims 1 and 2 are rejected on the reasons of record. These claims merely call for an endless belt screen made of the textile material, so applicant's argument is inapplicable. Screens are used for all kinds of material so the material treated cannot serve as a patentable distinction."

On June 10, 1940, Miller, through his attorney, wrote to the Patent Office, canceling Claims 1 and 2.

So great is the similarity of the rejected claims to the allowed ones, that a

student of this record wonders how this apparent inconsistency in the Patent Office came about.

The plaintiffs' specious attempt to distinguish between the sheep and the goats will next be considered.

### 7. The Crossbars and the Cross Slats

The two rejected claims made no mention of crossbars or cross slats. On the other hand, both of these types of fishnet support are specified in Claims 1 and 2 of the patent as granted. On his redirect examination, with reference to rejected Claim No. 1 Miller testified that "the fishnet would not work without the supporting cross slats". Miller made the same comment regarding the Thys patent, supra, in which Doble conceded that cross slats and what counsel called "cross rods" "are not shown specifically". This contention as to the inoperability of the rejected claims will be considered in a moment.

The use of crossbars and cross slats on chains is old. Miller himself admitted this. Doble testified that a cross slat "is a ledge placed on a conveyor, which is a very common practice * * *. It is a very common expedient for lodging material on a conveyor belt." Hamachek, in No. 1,153,304, granted on September 14, 1915, for a pea-separator, teaches that "The inclined chute 86 discharges onto an inclined conveyor belt 91 which is in the form of an apron of canvas or other suitable material having slats 92."

Horst's No. 1,488,249, supra, shows a pair of endless "chains 5" that "are spaced apart to form a belt of any desired width and they are connected by means of a series of rods 6. Supported by each rod is a slat or plank 7 * * *. The slats 7 are sufficiently wide to overlap each other and they therefore present an inclined step-like surface upon which the hops to be cleaned are deposited," etc.

In Silver's leaf catcher, No. 1,895,268, patented on January 24, 1933, there is shown an inclined element which "prefer-

ably comprises a series of transversely disposed parallel bars, interlocking at their ends, forming an endless carrier one end of the series running over sprockets 2," etc.

The presence of crossbars and cross slats in Miller's patented claims, and the absence thereof in the rejected Claims 1 and 2, are not sufficient to explain the apparent inconsistency of the Patent Office in allowing the former and disallowing the latter. The rejected claims were not thrown out because they were *inoperable* without bars or slats, but because their teaching of "an endless" belt screen made of the textile material" did not "constitute invention". And we must ever bear in mind Miller's statement: *the mesh is the invention.*

### 8. The Principle of Integration

Both in physics and in metaphysics, the principle of *integration* is fundamental in human thinking. Dr. George P. Conger [3] defines it thus:

"I mean now by integration a combination, or successive combinations, of parts forming wholes which, as wholes, have properties other than those of the parts taken severally.

\* \* \* \* \* \*

"All that need be claimed is that the whole, or integrate, is other than its parts when the latter are taken severally." [4]

Though Doble did not refer to the principle of integration *eo nomine*, he applied this test to the patent, and found Miller's device wanting. The defense expert's testimony on this point was emphatic, unequivocal, and reiterated:

"There is nothing startling, nothing beyond the addition of one element to another element to make up the assemblage of parts.

\* \* \* \* \* \*

"Each (function in the claims) contributes its little portion as it did in the art. *In other words, it is merely add-*

3. Professor of philosophy, chairman of department, University of Minnesota.

4. "Integration", in "Essays in East-West Philosophy", edited by Dr. Charles A. Moore and published by the University of Hawaii Press (1951), at pages 271 and 273.

ing: *two and two makes four.* There is no surprising result, nothing unexpected. It is merely the summation of the operations—functions of the elements that are old in the art.

\* \* \* \* \* \*

"There is no new or startling function. It is merely the added function of each of the elements. There is nothing, you might say, spontaneous or creating something new. It is merely the addition of two and two equal four. *Each of the elements contributes only just what it had done in the prior art, and the total result is a summation of each one of those individual elements and not something beyond that.*" (Emphasis supplied.)

In other words, Miller's combination patent lacks *integration.*

A careful comparison of the patent in suit with the disclosures in the prior art convinces this Court that Doble's appraisal of the plaintiffs' device is correct.

9. *Commercial Success*

In their briefs, the plaintiffs stress "the striking commercial success" of their patented article.

The Supreme Court has held, however, that "without significance on the question of novelty is the fact that \* \* utility resulted and commercial success followed from what patentees did." [5]

10. *The Great Atlantic & Pacific Tea Co. Case*

So apposite to the instant case are the legal principles enunciated by the Supreme Court in its recent decision in Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., supra, that it is possible to apply, almost sentence by sentence, the language there used to the various elements of the instant case.

In that case, the asserted invention was of a cashier's counter equipped with a three-sided frame, or rack, with no top or bottom, which, when pushed or pulled, would move groceries deposited within it

by a customer to the checking clerk and leave them there when it was pushed back to repeat the operation. It was kept on the counter by "guides".

There, as here, three claims of a combination patent were challenged on the ground of want of invention.

Let us now apply the language there used to the situation at bar.

1. "\* \* \* *if the extension itself were conceded to be a patentable improvement of the counter, and the claims were construed to include it, the patent would* \* \* \* *be invalid for overclaiming the invention by including old elements, unless, together with its other old elements, the extension made up a new combination patentable as such.*" 340 U.S. at page 150, 71 S.Ct. at page 129.

In the instant case, Miller testified that the fishnet is the invention; or, at most, the fishnet plus the crossbars and the cross slats. Yet his claims cover many other old elements, such as spaced endless sprocket chains, upper and lower pairs of sprocket gears to support the chains, means for maintaining a continuous flow of air through the netting material, etc.

And, as has already been shown in some detail, the old elements that he testifies are the invention, and the other old elements that, in his testimony, Miller does *not* claim as his invention, do not make up a new combination patentable as such.

2. "*The conjunction or concert of known elements must contribute something; only when the whole in some way exceeds the sum of its parts is the accumulation of old devices patentable.*" 340 U.S. at page 152, 71 S.Ct. at page 130.

This involves the principle of "integration", which has already been fully discussed, with especial reference to the patent.

3. "*This case is wanting in any unusual or surprising consequences from*

---

5. Toledo Pressed Steel Co. v. Standard Parts, Inc., 1939, 307 U.S. 350, 356–357, 59 S.Ct. 897, 900, 83 L.Ed. 1334. See also Dow Chemical Co. v. Halliburton Oil Well Cementing Co., 1945, 324 U.S. 320, 330, 65 S.Ct. 647, 89 L.Ed. 973.

*the unification of the elements here concerned"*. 340 U.S. at page 152, 71 S.Ct. at page 130.

"The fabric cord from which the net is woven presents a nap-like surface" just as it did in the days of Peter, the Big Fisherman. There are no unusual or surprising consequences from the unification of any of the old elements here concerned. It is to be expected that "leaves, petals and stems" are likely to "adhere to the surface of the netting".

4. *"Two and two have been added together, and still they make only four."* 340 U.S. at page 152, 71 S.Ct. at page 130.

This is almost the identical language used by the defense expert Doble. The emphasis placed by counsel upon the fact that *every* element of this patent—including the *fishnet*—is "old and ancient", will be recalled. And we have seen that the addition of these ancient and accepted elements "still * * * make(s) only four".

5. *"But commercial success without invention will not make patentability. * * * When, for the first time, those elements were put to work * * * although each performed the same mechanical function * * * that it had been known to perform, they produced results more striking, perhaps, than in any previous utilization. To bring these devices together and apply them * * * was a good idea, but scores of progressive ideas in business are not patentable, * *."* 340 U.S. at page 153, 71 S.Ct. at page 130.

■ So here, the plaintiffs claim a "striking" commercial success, using the very adjective employed by the Supreme Court in describing the results of the "utilization" it was there considering. Yet the Court did not hold, as the plaintiffs

here claim for their device, that such "commercial success" "corroborates the existence of invention". Invention must be shown independently; and this the plaintiffs have not done. The most that can be said for their device is that it is a "good" and "progressive" "idea"; but it is one of "scores of progressive ideas in business (that) are not patentable".

6. *"* * * a standard of invention appears to have been used that is less exacting than that required where a combination is made up entirely of old components."* 340 U.S. at page 154, 71 S.Ct. at page 131.

The hyperbole indulged in by the plaintiffs and by at least one of their witnesses, with regard to the patent, illustrates the error that parties fall into when they accept a standard of invention less exacting than that required for an old-component device. The Court believes that the Patent Office fell into the same error.

Although only two years old, the Great Atlantic & Pacific Tea Co. case already has been followed by the Supreme Court itself, by our Court of Appeals, and by a large number of other Federal courts.[6]

## 11. The New Patent Code

■ On July 19, 1952, Congress enacted a revision and codification of the patent law, effective January 1, 1953. The plaintiffs argue at some length that "By the fact of codification, the Congress has put the stamp of approval upon the affirmative tests of invention announced by plaintiffs' authorities".

A careful study of this new patent code, however, convinces this Court that Congress has not intended to change any of the classical norms by which invention shall be tested.

For example, Section 103 of the new Title 35, quoted in full by the plaintiffs, reads as follows:

6. Crest Specialty, a Limited Partnership v. Trager, 1951, 341 U.S. 912, 71 S.Ct. 733, 95 L.Ed. 1349; Photochart v. Photo Patrol, Inc., 9 Cir., 1951, 189 F.2d 625, 627, certiorari denied, 1951, 342 U.S. 867, 72 S.Ct. 107, 96 L.Ed. 652, rehearing denied, 1952, 342 U.S. 907, 72 S.Ct. 290, 96

L.Ed. 679; Park-in-Theatres v. Perkins, 9 Cir., 1951, 190 F.2d 137, 140. On the point of "overclaiming the invention by including old elements", see the very recent case of Aetna Ball & Roller Bearing Co. v. Standard Unit Parts Corp., 7 Cir., 1952, 198 F.2d 222, 227.

"A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made."

The plaintiffs also quote the Reviser's Note on Section 103, supra:

"There is no provision corresponding to the first sentence explicitly stated in the present statutes, but the refusal of patents by the Patent Office, and the holding of patents invalid by the courts, on the ground of lack of invention or lack of patentable novelty has been followed since at least as early as 1850. This paragraph is added with the view that an explicit statement in the statute may have some stabilizing effect, and also to serve as a basis for the addition at a later time of some criteria which may be worked out.

"The second sentence states that patentability as to this requirement is not to be negatived by the manner in which the invention was made, that is, it is immaterial whether it resulted from long toil and experimentation or from a flash of genius."

It is difficult to perceive how the plaintiffs can gather comfort from either this section or the Reviser's Note thereon. It would seem that Congress here has clearly indicated that it did not intend to lower the standard of invention which ob-

tained before the new codification—"since at least as early as 1850." The purpose of the new revision, as the Reviser's Note points out, is not to *revolutionize* but to "stabilize" existing law.

## 12. The Question of Infringement

■ The modern and the better view seems to be that, once a court finds that a patent is invalid, it need not proceed to determine the question of infringement.

In Cover v. Schwartz, 2 Cir., 1943, 133 F.2d 541, 545, certiorari denied, 1943, 319 U.S. 748, 63 S.Ct. 1158, 87 L.Ed. 1703, the Court said:

"The court, in deciding against a patentee plaintiff, may, with propriety, hold (1) that his patent is invalid, or (2) that the defendant has not committed acts of infringement, or (3) that not only is the patent invalid but also that the defendant has not infringed; * * *." (Emphasis supplied.)

The foregoing case was cited with approval in Sinclair & Carroll Co., Inc., v. Interchemical Corporation, 1945, 325 U.S. 327, 330, 65 S.Ct. 1143, 89 L.Ed. 1644.[7]

Indeed, strict logic would dictate that, once invalidity is found, a court should proceed no further. An invalid patent, like a corporate security issued without a permit,[8] is "a blank piece of paper"; and a blank piece of paper cannot be infringed.

## 13. Conclusion

After listening to the testimony and carefully examining the prior art, the Court is convinced that the patent in suit is invalid for want of invention.

Findings of fact and conclusions of law consistent with the foregoing are to be served and lodged by the defendant.

7. See also Katz v. Horni Signal Mfg. Corporation, 2 Cir., 1944, 145 F.2d 961, 962, note 4, certiorari denied, 1945, 324 U.S. 882, 65 S.Ct. 1029, 89 L.Ed. 1432.

8. Black v. Solano Co., 1931, 114 Cal.App. 170, 176, 299 P. 843, quoted with approval in Hirschfeld v. McKinley, 9 Cir., 1935, 78 F.2d 124, 133, certiorari denied, 1936, 297 U.S. 703, 56 S.Ct. 384, 80 L.Ed. 991.