**GLEN RAVEN KNITTING MILLS, Inc. v. SANSON HOSIERY MILLS, Inc. et al.**

No. 6218.

United States Court of Appeals, Fourth Circuit.

Argued April 6, 1951.

Decided May 11, 1951.

Joseph G. Denny, Jr., Philadelphia, Pa. (Thornton H. Brooks, L. P. McLendon, and Brooks, McLendon, Brim & Holderness all of Greensboro, N. C., on the brief) for appellant.

Henry N. Paul, Jr., Philadelphia, Pa. (Robert B. Frailey, Philadelphia, Pa., Julius C. Smith, Armistead W. Sapp, Greensboro, N. C., Paul & Paul, Philadelphia, Pa., and Smith, Sapp, Moore & Smith, Greensboro, N. C., on the brief) for appellees.

Before PARKER, SOPER and DOBIE, Circuit Judges.

SOPER, Circuit Judge.

This is a suit for infringement of a design patent for an ornamental design on women's hosiery. The defense challenges the validity, denies infringement and alleges non-enforceability of the patent because of abuse of the monopoly. The evidence shows that the contentions of non-infringement and abuse of monopoly are utterly lacking in merit; the trial court so held; and we shall confine ourselves chiefly in this appeal to the question of validity which was also decided below in favor of the plaintiff.

The patent in suit, U. S. Patent No. Des. 151,732, is one of two patents issued on November 16, 1948 to William G. Bley, the inventor, and Richard C. Spurgeon, an assignee of the invention and the patent application. Bley and Spurgeon, trading as partners, later assigned one-half interest in the patent to Sanson Hosiery Mills, Inc., and these are the parties plaintiff before us. The owners of the patent have granted various licenses under it, one to Spurgeon Hosiery Corporation, another to Vo-Jul Textiles, Inc., and another to Cressida, Inc. The Sanson Hosiery Mills manufactures stockings under trade marks "Picturesque" and "Picture Frame". Spurgeon Hosiery Corporation, one of the aforesaid licensees, uses the mark "Dupliquette".

In January, 1949 Sanson publicly exhibited its stockings with the patented design at a hosiery exhibition in New York which was attended by the Vice-President of Glen Raven Knitting Mills, Inc. Sanson alleges that later in the same month it mailed notice to approximately 650 full-fashioned hosiery manufacturers, including the defendant Glen Raven, of its rights under the patent. Glen Raven, who denies receipt of any such notice, began making the infringing stocking in May, 1949 at the request of a customer, and this suit was brought in September.

Since 1870, as is evidenced by the fact that 180 of 409 patents relating to design for hosiery related to the heel and foot-sole area, numerous inventor-designers

have attempted to beautify the heel and foot area of the lady's stocking. They did so by varying the contours of the opaque heel and foot reinforcements and by the use of "clocks"—woven, knitted, or embroidered ornaments—bordering the opaque reinforced areas. The efforts of these designers have met with no substantial success of a permanent nature although there is some evidence that contrasting color heels and "clocks" bordering variously shaped heels were popular during the 1928–1930 period.

At the close of the Second World War when goods began to reappear on the store counters in abundance, stockings were no exception and resort to novelties was an obvious expedient to increase sales. In 1947 Bley conceived of the idea of framing the reinforcement of the heel, sole and toe without changing its conventional contour. The frame or border was knitted in by using the standard Pointex attachment of the knitting machine to control the movements of the carrier rods so that the steps in the frame line would be the same as the steps in the outline of the reinforcement. The resultant frame or border, of the same thickness as the reinforcement, parallels the marginal contour of the reinforcement and resembles a picture frame—hence the trade mark "Picture Frame" used by Sanson. Design patent No. 151,733 covers only a framing of the heel, whereas No. 151,732 here in issue, extends to the framing of the entire heel and cradle of the stocking.

Notwithstanding defendant's contentions to the contrary, it is plain that Bley's new stocking was immediately accepted by the public. Spurgeon Hosiery Corporation, which was a small company of twenty employees in March, 1948, took a license under the patent and rapidly expanded to four times its size. Its sales jumped from 10,000 dozen pairs at the end of 1948 to 26,000 dozen pairs at the end of 1949. In a leading store in Philadelphia, sales of "Dupliquette" constituted 65% of the entire sales even though competing brands were made by seven of the largest and most prominent manufacturers of full-fashioned hosiery.

It is significant too that sales continued to jump despite the fact that the retail prices were higher than the price of comparable quality hose.

Sanson began the manufacture of the patented stocking in January, 1949. Previously it had sold high quality branded stockings under the name of Artcraft Hosiery Company but had found it so unprofitable that it sold its name to another company and changed over to the unbranded line, reducing its customer accounts from 500 to 15 or 20, and eliminating its sales force entirely. Embarking upon the sale of branded hosiery again when it became part owner of the Bley patent, Sanson first offered the new stocking in December, 1948. Within sixteen months Sanson's new customer accounts increased from 11 to 3,981 and in the first year its sales rose from 3,000 dozen pairs a month to 48,000 dozen pairs a month. By the end of 1949 its product was to be found in all of the forty-eight states, in the territories and possessions of this country, and in twenty-six foreign countries. At the time of trial, Sanson's yearly business, exclusive of royalties under the patent, was estimated at $10,000,000.

The popularity of the stocking is further attested by the acceptance of licenses by other manufacturers and especially by the numerous efforts of other manufacturers to imitate or copy the Bley design. Thirty-eight photographs on exhibit show unabashed attempts to copy, and most of them do not display even an attempt to introduce a subtle variation to the design. In the numerous suits brought by the plaintiffs to enforce their patent, over twenty consent decrees have been signed by different defendants who admitted the validity of the patent and the infringement.

The complete lack of merit in the defense of non-infringement is shown by a comparison of the patented design (on the left) with the design used by the defendant (on the right) as illustrated by the following pictures:

PX G2

Glen Raven

PX G1

Picturesque

The defendant attacks the validity of the patent on grounds of anticipation, lack of invention, a design within the expected skill of the calling, public use, lack of patentable subject matter, insufficiency of disclosure and indefiniteness of claim. Offering thirteen mechanical patents and six design patents in evidence, in addition to numerous advertisements and publications, the defendant shows that the reinforcement area and a border along it in women's stockings were old, that it had long been known and disclosed in prior patents how to place a border or frame line parallel to the reinforcement area, and that it was within the powers of an ordinary designer of hosiery and an experienced knitter as a matter of course to make the required adjustments to a machine to produce a border. The defendant contends that the test of invention for a design patent is the same as that required for a mechanical patent and that the patentee failed to make any inventive contribution in view of the disclosures of the prior art.

The patents in closest support of the defendant's position are Schletter patent No. 1,531,349, Phillips patent No. Des. 76,495, Hemmerich patent No. 2,338,075, Nissen patent No. Des. 66,253, and Nebel patent No. Des. 73,620.

The Nebel design is closest in approaching that of Bley in that it involves in part a border spaced from and paralleling the contour of the heel reinforcement; however, the design, taken as a whole, is distinctly different in appearance. In Nebel the heel reinforcement rises vertically from the footsole, then it tapers off only to widen and taper again to form a diamond shaped figure atop a tapered heel. Beginning at the point where the heel reinforcement first tapers, a border of the same fabric as the reinforcement and spaced uniformly from it, follows the contour of the taper and the diamond shape and then forms a cross when opposite the apex of the heel reinforcement.

Statutes have protected design patents since 1842. Act Aug. 29, 1842, 5 Stat. 543. The present Act, passed in 1902, 32 Stat. 193, 35 U.S.C.A. § 73, authorizes the issuance of a design patent to "Any person who has invented any new, original, and ornamental design for an article of manufacture". Cases have construed these statutes until today the law of design patents is well crystalized and the chief difficulty lies in applying the law to the facts. In Gorham Co. v. White, 14 Wall. 511, 81 U.S. 511, 20 L.Ed. 731, the court construed the 1842 Act which read "invented or produced any new and original design." The court said: 14 Wall. at pages 524–525–526, 20 L.Ed. 731. "The acts of Congress which authorize the grant of patents for designs were plainly intended to give encouragement to the decorative arts. They contemplate not so much utility as appearance, and that, not an abstract impression, or picture, but an aspect given to those objects mentioned in the acts. * * * And the thing invented or produced for which a patent is given, is that which gives a peculiar or distinctive appearance to the manufacture, or article to which it may be applied, or to which it gives form. The law manifestly contemplates that giving certain new and original appearances to a manufactured article may enhance its salable value, may enlarge the demand for it, and may be a meritorious service to the public. It therefore proposes to secure for a limited time to the ingenious producer of those appearances the advantages flowing from them. Manifestly the mode in which those appearances are produced has very little, if anything, to do with giving increased salableness to the article. It is the appearance itself which attracts attention and calls out favor or dislike. It is the appearance itself, therefore, no matter by what agency caused, that constitutes mainly, if not entirely, the contribution to the public which the law deems worthy of recompense. The appearance may be the result of peculiarity of configuration, or of ornament alone, or of both conjointly, but, in whatever way produced, it is the new thing, or product, which the patent law regards. * * * We do not say that in determining whether two designs are substantially the same, differences in the lines, the configuration,

or the modes by which the aspects they exhibit are not to be considered; but we think the controlling consideration is the resultant effect."

 Gorham Co. v. White, supra, sets forth the salient features of the statute and the purpose which it was designed to serve; but the court was concerned with the infringement and not the valid- ity of the patent in suit. Later cases developed the standards to be used when the validity of a design patent was at issue. Validity is to be tested by the appearance of the patented design as a whole. Dobson v. Dornan, 118 U.S. 10, 15, 6 S.Ct. 946, 30 L.Ed. 63. "A combination of elements that are old is patentable, if it produces a new and useful result as the

The Schletter patent reveals a square heel continuous with the footsole which has a clock extending in a uniformly spaced parallel relation from the juncture of the heel and footsole, along the footsole for a short distance and extending in the opposite direction along the vertical edge of the heel reinforcement upward to a point well above the horizontal line of the heel.

R. E. Schletter

1,531,349

March 31, 1925

The Phillips design shows a tapering heel, the sides of which are paralleled by clocks which continue to rise vertically for some distance on either side of the seam, once having reached the summit of the heel reinforcement.

J. A. Phillips

Des. 76,495

October 2, 1928

product of the combination; and a design which avails itself of suggestions old in art is patentable, if as a whole, it produces a new and pleasing impression on the aesthetic sense." Matthews & Willard Mfg. Co. v. American Lamp & Brass Co., 3 Cir., 103 F. 634, 639. Nevertheless, there must be an exercise of the inventive faculty, and if the design lacks this quality, it will not suffice to say that it is new,

The Hemmerich patent and the Nissen patent show contrasting borders along the heel and the entire heel footsole, respectively. In both cases the fabric on either side of the border is contrasting so that the border is not of the same fabric as the reinforcement spaced apart from it.

H. Hemmerich

2,338,075

December 28, 1943

J. P. Nissen

Des. 66,253

Dec. 16, 1924

852

original and ornamental, and has received wide public acceptance. Smith v. Whitman Saddle Co., 148 U.S. 674, 13 S.Ct. 768, 37 L.Ed. 606; S. Dresner & Son v. Doppelt, 7 Cir., 120 F.2d 50; Conn. Paper Products v. New York Paper Co., 4 Cir., 127 F.2d 423; Cavu Clothes v. Squires, Inc., 6 Cir., 184 F.2d 31; Knickerbocker Plastic Co. v. Allied Molding Corp., 2 Cir., 184 F.2d 652. "In short, the test is whether the design involved 'a step beyond the prior art requiring what is termed "inventive genius" '." General Time Instrument Corp. v. U. S. Time Corp., 2 Cir., 165 F.2d 853, 854.

The District Judge was of the opinion that the Bley design measures up to this standard of patentability, and we are in agreement with this view. There had been numerous attempts during the course of many years to improve the unfinished appearance and relieve the contrast in the border line between the body and the thickened reinforcement of the heel and sole of the stocking. None of Bley's predecessors had achieved the pleasing result which flowed from the simplicity and effectiveness of Bley's design, which immediately appealed to the good taste of many wearers. The resultant effect of the opaque form

Fig. 1.

Fig. 2.

Des. 73,620

E. O. Nebel

October 11, 1927

surrounding the opaque reinforcement is novel and striking and yet is so simply produced with only a slight alteration of existing machinery as to indicate an exercise of the inventive faculty beyond the powers of an ordinary designer. Nebel had the idea of framing the reinforcement but employed it in an entirely different manner, and his bold and conspicuous design lacked the refinement of Bley and doubtless on that account achieved no great success.

It is true that the patent lies in a restricted field and pertains to an article that may seem of minor importance in the development of the industrial arts. But all design patents are of the limited scope which is attendant upon appearance rather than utility; and Congress has ordained in the statute covering design patents, 35 U.S.C.A. § 73, that a patent shall be granted to "Any person who has invented any new, original, and ornamental design for an article of manufacture". It is on this plane that the merits of the design must be judged; and it must be borne in mind that the inventive skill as well as the originality, which are essential to validity, relate entirely to the appearance of the article and the appeal to the eye. Hence, as pointed out in the quotation from Gorham Co. v. White, supra, which first construed the design statute, 14 Wall. at page 525, 20 L.Ed. 731, "it is the appearance itself * * * that constitutes mainly, if not entirely, the contribution to the public which the law deems worthy of recompense. The appearance may be the result of peculiarity of configuration or of ornament alone, or of both co-jointly, but in whatever way produced, it is the new thing or product which the patent law regards."

It is therefore obvious that in dealing with patents of this kind much weight must be given to commercial success, and all the more so when wearing apparel, which must please the buyer, is the subject to which the design applies. No one will deny the great practical importance of the manufacture of women's clothing in the industrial field or that persons skilled in the art are constantly endeavoring to produce garments that will have popular appeal. The fact that prior to the spectacular success of the Bley design such an effort was made for a long period in the limited field to which this case applies is sufficient proof that the patentee's contribution was not obvious to the ordinary person, and justifies the finding that the patent is valid. The especial importance of commercial success in determining the validity of design patents is recognized by the decisions of the courts. See J. R. Wood & Sons, Inc., v. Abelson's, Inc., 3 Cir., 74 F.2d 895; Standard Match Corp. v. Bell Mach. Co., 7 Cir., 83 F.2d 365, 367. The immediate success of the "Picturesque", "Picture Frame" and "Dupliquette" stocking, its command of a higher price, its refined simplicity and ease of manufacture, its acceptance by competitors, and its reception and acclaim by the world-wide public all attest to something more than commonplace ornamentation or uninspired reassembly of old ideas.

The assertion that the Bley patent is void for indefiniteness of claim and insufficiency of disclosure is without foundation. The specification of the patent was accompanied by lucid illustrations of the design, and the law is clear that sufficient description and claim of design is achieved by reference to an annexed drawing. Dobson v. Dornan, 118 U.S. 10, 6 S.Ct. 946, Geo. Borgfeldt & Co. v. Weiss, 2 Cir., 265 F. 268. Cf. Ashley v. Samuel C. Tatum Co., 2 Cir., 186 F. 339.

The defendant claims that the patent, if valid, is unenforceable because the plaintiffs have abused their patent monopoly by entering into illegal price fixing agreements. The evidence shows that Sanson, one of the owners of the patent, and Spurgeon, a licensee, in distributing their branded stockings to retailers, exercised the right under state fair trade laws and the Miller-Tydings Act to prescribe minimum prices for resale in states having such statutes. No licensee of the patent other than Spurgeon was shown to fair trade its product. Cressida, Inc., another licensee of the owner, was required by its license to sell at not less than the licensor's prevailing list prices. This evidence is far from proof of a conspiracy to fix prices in viola-

tion of the Sherman Act, and the trial court so found.

▮ To exact a covenant of a licensee limiting the price at which the patented product may be sold is within the lawful privilege of the patent. U. S. v. General Electric Co., 272 U.S. 476, 490, 47 S.Ct. 192, 71 L.Ed. 362; See U. S. v. Line Material Co., 333 U.S. 287, 310–312, 68 S.Ct. 550, 92 L.Ed. 701; U. S. v. Gypsum Co., 340 U.S. 76, 84, 71 S.Ct. 160. Likewise, agreements with dealers which fix resale prices of a commodity "which is in free and open competition with commodities of the same general class produced or distributed by others" do not violate the Sherman Act by reason of the Miller-Tydings Amendment. 26 Stat. 209, as amended, 50 Stat. 693, 15 U.S.C.A. § 1. See U. S. v. Frankfort Distilleries, 324 U.S. 293, 296, 65 S.Ct. 661, 89 L.Ed. 951; U. S. v. Bausch & Lomb Co., 321 U.S. 707, 721, 64 S.Ct. 805, 88 L.Ed. 1024. Cf. Schwegmann Bros. v. Calvert Distillers Corp., 341 U.S. 384, 71 S.Ct. 745.

▮ The defendant, relying on Eastman Kodak Co. v. F. T. C., 2 Cir., 158 F.2d 592, certiorari denied 330 U.S. 828, 67 S.Ct. 869, 91 L.Ed. 1277, argues that the Miller-Tydings exemption is inapplicable to these resale agreements since the patented stocking, if so distinctive as to justify a patent, is not in the same general class as plain stockings and hence it is not being sold in free and open competition with commodities of the same general class. The statute, however, does not differentiate between patented and unpatented products. The Supreme Court has indicated that the Miller-Tydings Act is applicable to patented articles, U. S. v. Univis Lens Co., 316 U.S. 241, 250, 62 S.Ct. 1088, 86 L.Ed. 1408, and it defies common sense to say that addition of a design to a stocking takes it out of the same general class of stockings of its competitors. In the Eastman Kodak case, color photographic film was held not to be in the same general class as black and white film, within the meaning of the Miller-Tydings Act, and hence a different conclusion was reached.

The judgment is affirmed.