**R. M. PALMER COMPANY,**
Plaintiff,

v.

**LUDEN'S, Inc., Defendant.**

Civ. A. No. 12846.

United States District Court,

E. D. Pennsylvania.

Feb. 7, 1955.

fringement of its Design Patents No. 157,621 (chocolate rabbit) dated March 7, 1950, No. 161,521 (chocolate duck) dated January 2, 1951, No. 161,522 (chocolate lamb) dated January 2, 1951, and No. 161,865 (chocolate squirrel) dated February 6, 1951, and in addition thereto, charges defendant with unfair competition. Defendant has denied infringement and has challenged the validity of the patents. Both plaintiff and defendant are Pennsylvania corporations engaged in the manufacture of candy, with the principal places of business in the City of Reading in this district.

In 1948 Richard M. Palmer started in the candy business in Reading, Pennsylvania, on a small scale, with seven or eight employees and with secondhand machinery. In 1950 Palmer secured his first patent on a chocolate rabbit, and in the following year he secured patents on a chocolate duck, a chocolate lamb and a chocolate squirrel. On October 18, 1951 Palmer, by written assignment, assigned all four of the said patents to plaintiff.

Prior to 1948 figure candy products were solely of the standard or conventional type, similar to the German "Reiche" molds. The figures were of a realistic type that had been on the market for many years, the animals being in proportion and in natural postures.

Palmer's figures departed from the realistic or conventional type to that of the caricature and in so doing injected into the practically dormant hollow chocolate confection art an element of romanticism which proved to have tremendous sales appeal—for instance,

Paul & Paul, Philadelphia, Pa., for plaintiff.

Howson & Howson, Philadelphia, Pa., for defendant.

FOLLMER, District Judge.

R. M. Palmer Company brings this action against Luden's, Inc., charging in-

|  | Easter of 1949 | Easter of 1953 |
|---|---|---|
| Rabbit | 18,233 dozen | 138,280 dozen |
|  | Easter of 1950 | Easter of 1953 |
| Duck | 13,000 plus dozen | 29,000 plus dozen |
|  | Easter of 1951 | Easter of 1953 |
| Lamb | 14,000 dozen | 36,000 plus dozen |
| Squirrel | 35,000 dozen | 58,000 plus dozen |

We are here concerned with design patents which are specifically cover-

ed by statute.[1] Since 1842 the statutory requirements for design patents have been that the design be new and original. In 1871 the Supreme Court[2] in interpreting the Act of 1842 laid down certain fundamental tests which have since become settled case law and were, in fact, incorporated in the Act of July 19, 1952, at which time the patent statutes were "completely rewritten".[3] The Gorham case, supra, added a new requirement as follows, 14 Wall. at page 524:

"The acts of Congress which authorize the grant of patents for designs were plainly intended to give encouragement to the *decorative* arts. * * *" (Emphasis supplied.)

Consequently, since the Gorham case the courts have uniformly held as requirements for patentability of designs, novelty, originality and ornamentation, i. e., that they be new, original and ornamental (decorative). As above indicated, these three tests (1 and 2 statutory and 3 case) were incorporated in the Act of 1952.

■ The purpose back of the design patent legislation has been well stated in Forestek Plating & Mfg. Co. v. Knapp-Monarch Co., 6 Cir., 106 F.2d 554, 559, as follows:

"* * * It was the intent of the Congress in the adoption of the design patent law to encourage ornamentation and beautification in manufactured articles so as to increase their salability and satisfy the aesthetic sense of the purchasers."[4]

In addition to the above, Section 103 of the Act of 1952 provides as follows:

"A patent may not be obtained * * *, if the differences between

1. 35 U.S.C. § 171.

2. Gorham Mfg. Company v. White, 14 Wall. 511, 81 U.S. 511, 20 L.Ed. 731.

3. Commentary on The New Patent Act, 35 U.S.C. §§ 1 to 110, Page 1.

4. See also, Application of Krueger, 208 F. 2d 482, 483, 41 C.C.P.A., Patents, 757, where the court said:
"One purpose Congress had in mind in

the subject matter sought to be patented and the prior art are such that *the subject matter as a whole would have been obvious* at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. *Patentability shall not be negatived by the manner in which the invention was made."* (Emphasis supplied.)

The general part of the Committee Report, with reference to Section 103, 35 U.S.C. §§ 1 to 110, Commentary, Page 20, states as follows:

"'Section 103, for the first time in our statute, provides a condition which exists in the law and has existed for more than 100 years, but only by reason of decisions of the courts. An invention which has been made, and which is new in the sense that the same thing has not been made before, may still not be patentable if the difference between the new thing and what was known before is not considered sufficiently great to warrant a patent. That has been expressed in a large variety of ways in decisions of the courts and in writing. Section 103 states this requirement in the title. It refers to the difference between the subject matter sought to be patented and the prior art, meaning what was known before as described in section 102. If this difference is such that the subject matter as a whole would have been obvious at the time to a person skilled in the art, then the subject matter cannot be patented.

"'That provision paraphrases language which has often been used in decisions of the courts, and the sec-

the enactment of the statute authorizing the grant of a patent on any new, original and ornamental design for an article of manufacture was to enhance the salability of such articles in competitive markets through an aesthetic appeal to the purchasing public. * * * It is a law which requires meticulous care in its administration to avoid infringement and prevent great harm to legitimate industry. * * *"

tion is added to the statute for uniformity and definiteness. This section should have a stabilizing effect and minimize great departures which have appeared in some cases.' "

At this point it might be appropriate to call attention to the last sentence of Section 103, supra. In 1941 the Supreme Court in Cuno Engineering Corp. v. Automatic Devices Corp., 314 U.S. 84, 91, 62 S.Ct. 37, 41, 86 L.Ed. 58, in the following words, "the new device, however useful it may be, must reveal the flash of creative genius, not merely the skill of the calling", injected into the matter of patentability a new subjective test which immediately became known as the "flash of genius test."

This additional requirement met with widespread opposition which was well expressed in Chicago Steel Foundry Co. v. Burnside Steel Foundry Co., 7 Cir., 132 F.2d 812, 817, as follows:

"The test of a 'flash of genius' should be rejected not only because it is incapable of acceptable definition but because it injects into the statute something not appearing therein. The Federal decisions covering a century contain many to the effect that *it is the fact of accomplishment,*—novelty appearing, rather than the method of accomplishment with which judicial inquiry is concerned."

■ It was the intention of Congress in Section 103 to eliminate the rigid subjective "flash of genius" requirement. As stated in the Commentary on The New Patent Act, supra, page 23, "The Revision Note adds in explanation that it is immaterial whether it resulted from long toil and experimentation or from a flash of genius. This sentence in the section further indicates the attitude of Congress in enacting the new patent act and should have a bearing on the interpretation of section 103 as a whole."

The new act also provides, Section 282:

"A patent shall be presumed valid. The burden of establishing invalidity of a patent shall rest on a party asserting it."

Thus we find in statutory form a confirmation of that which was case law for many years prior thereto.[5]

As related to the chocolate industry, I find nothing in the prior art which anticipates plaintiff's designs. I do not understand that defendant claims any such anticipation. Prior patents (Wolf Design Patent No. 155,254 and Woods Design Patent No. 155,115, both toy animal figure design patents) now relied upon by defendant were considered by the Patent Examiner during the prosecution of Palmer's patent applications. In addition thereto, defendant at the trial offered thirty-five publications showing toys, playthings, dolls, novelties and the like in the form of animals, all of which appear to be made of rubber, plastic, wood, stuffing and a great variety of other materials. None of this art is analogous to the art of designing hollow chocolate animal figures[6] and none shows animals resembling the Palmer patented designs. As a matter of fact, defendant frankly stated that these references were offered merely to show the state of the art and not to show anticipation.[7]

The fact that defendant seems to belabor at considerable length the idea that by piecing together legs, ears, eyes, bodies, etc., of these prior art animals one might create designs is indicative of de-

5. Gagnier Fibre Products Co. v. Fourslides, Inc., D.C.E.D.Mich., 112 F.Supp. 926, 929; Florence-Mayo Nuway Co. v. Hardy, 4 Cir., 168 F.2d 778, 781.

6. Because of the frailty of the material used and likelihood of breakage and the totally different manufacturing technique.

7. The defendant's numerous references to everything but the art here involved is analogous to the situation where excessive references are made to prior patents which as pointed out in Ric-Wil Co. v. E. B. Kaiser Co., 7 Cir., 179 F.2d 401, 404, " * * * is in itself persuasive of the futility of prior attempts to solve the problem."

fendant's difficulty in finding any prior designs similar to Palmer's.[8]

Defendant's reply brief on this question of validity takes on a Janus-faced appearance. It states (P. 3 R.B.):

"* * * the patentee merely *recognized a trend* which he admirably describes on pp. 25, 26 of the record. The trend is illustrated in the prior art exhibits introduced by Defendant (Ex. D–10M).

"The principal evidence that Plaintiff relies upon in support of invention is the commercial success achieved. This argument is a very unsafe one since (as the authorities cited in our main brief pp. 31, 32 point out) commercial success may be due to factors other than invention. If such factors are adequate to account for commercial success, the argument loses its force.

"Plaintiff treats this question in a section entitled: 'The Record Tells a Story of Invention'. (Plaintiff's main brief p. 10.) We disagree. *It is clear from the record that Mr. Palmer entered a static field.* * * *" (Emphasis supplied.)

Again on page 36 of defendant's main brief it refers to the hollow chocolate candy art as "an old and stagnant art in which it was inevitable that such figures would make their appearance as they had in other arts, Mr. Palmer or no Mr. Palmer." By the same token it might be said that Mr. Edison or no Mr. Edison it is inevitable that to-day we should be enjoying the incandescent light.

A static trend? Webster's New International Dictionary defines "trend" as "Underlying or prevailing tendency or inclination; general direction taken by something changing or subject to change. Syn.—Direction, movement, swing, drift, tendency." Static is defined as "resting; quiescent; not moving, active, or exerting force or influence of any kind; stable."

I do not agree with defendant's contention that the principal evidence that plaintiff relied upon in support of his inventions was the commercial success he achieved. I do agree with its statement that commercial success may be due to factors other than invention and that if such factors are adequate for commercial success, the argument loses its force.[9] In the instant case, however, without the support of the customary props of extensive and expensive sales, advertising or promotional programs, the patented designs became an immediate commercial success. No such hollow chocolate animal designs had ever before appeared on the market. They constituted a unique approach. They were new, they were original, and they were, moreover, ornamental as they immediately appealed to the public fancy. Nor can it be said that these designs were obvious in this art which had stood stagnant and static over a long period of years. Under the circumstances of this case, I certainly find nothing "unsafe" in thus evaluating here the unusual and progressively increasing success of plaintiff's patented designs.[10]

Defendant credits plaintiff with acumen and good judgment, but feels that what plaintiff did was nothing more than good designing done in "an intelligent but uninventive manner." This prompts the inquiry,—Why did defendant, with its large and capable staff of those skilled in the art, remain quiescent and continue for this long period of time in such an unimaginative manner (if all that was required was intelligence) in offering the public what they now say the public did not want?

Palmer may well be looked upon as a pioneer in his field.[11] Our evaluation of

8. Reynolds v. Whitin Mach. Works, 4 Cir., 167 F.2d 78, 83, 84.

9. See article by Judge Galston "Invention And The 'Obvious' ", 13 F.R.D. 463, 465.

10. Knickerbocker Plastic Co., Inc., v. Allied Molding Corp., 2 Cir., 184 F.2d 652; Glen Raven Knitting Mills, Inc., v. Sanson Hosiery Mills, Inc., 4 Cir., 189 F.2d 845, 853.

11. Hildreth v. Mastoras, 257 U.S. 27, 42 S.Ct. 20, 66 L.Ed. 112.

Palmer's function in this art is tersely epitomized by Judge Learned Hand in Western States Mach. Co. v. S. S. Hepworth Co., 2 Cir., 147 F.2d 345, 347, certiorari denied 325 U.S. 873, 65 S.Ct. 1414, 89 L.Ed. 1991,

> " * * * As we have often repeated, in judging what requires uncommon ingenuity, the best standard is what common ingenuity has failed for long to contrive under the same incentive."

As Justice Frankfurter stated in Marconi Wireless Telegraph Co. v. United States, 320 U.S. 1, 62, 63 S.Ct. 1393, 1421, 87 L.Ed. 1731.

> "The real question is how significant a jump is the new disclosure from the old knowledge. Reconstruction by hindsight, making obvious something that was not at all obvious to superior minds until someone pointed it out,—this is too often a tempting exercise for astute minds. The result is to remove the opportunity of obtaining what Congress has seen fit to make available."

Palmer, with a genius not possessed by others in the field, "created" something which caught the public's fancy and revealed the public demand which defendant now in retrospect [12] says was so obvious in spite of the fact that it concedes,

(1) that the art of designed chocolate figures "had lagged behind other fields";

(2) that the said art had been stagnant for a period of years;

(3) that no one else during that period who had "ordinary skill in the art to which said subject matter pertains" had done anything similar thereto;

(4) that there was an immediate public response to the new design;

(5) that defendant becoming aware (*after the occurrence*) of a "public de-

mand for novel and more *intriguing figures*" attempted to jump on the band wagon, not by using the ordinary skill in that art but by copying almost in detail what Palmer had created. (Emphasis supplied.)

■■■■ As to validity, certainly it may be said,

(1) the designs looked at as a whole (le tout ensemble) give a pleasing impression; [13]

(2) under the circumstances of this case, the four Palmer design patents were not obvious, at the time the designs were made, to a person having ordinary skill in the art to which they pertain;

(3) the results came from the exercise of the inventive faculty; [14]

(4) the designs were new, original and ornamental in this art.

We conclude that the four design patents are valid.

■■■■ Having found the Palmer designs valid, we are next met with the question of infringement. The test of infringement in design patent cases is that if in the eye of an ordinary observer giving such attention as a purchaser usually gives, two designs are substantially the same, and if the resemblance is such as to deceive such an observer, inducing him to purchase one supposing it to be the other, the patented design is infringed by the other. [15] Applying this test, a comparison of the Palmer and Luden designs clearly discloses a complete lack of merit in the defense of noninfringement. [16] For instance, as to the three design patents, duck, rabbit, and squirrel, the defendant's designs disclose a slavish copying. While as to the lamb, there are slight differences, namely, in defendant's design the ears of the lamb point upward, the tail points downward, and there is no flower in the mouth of

---

12. Goodyear Tire & Rubber Co., Inc., v. Ray–O–Vac Company, 321 U.S. 275, 279, 64 S.Ct. 593, 88 L.Ed. 721.

13. Franklin Lamp Mfg. Co., Inc., v. Albe Lamp & Shade Co., D.C.E.D.Pa., 26 F. Supp. 960; Laskowitz v. Marie Designer, Inc., D.C.S.D.Cal., 119 F.Supp. 541.

14. Laskowitz v. Marie Designer, Inc., supra (and cases cited therein).

15. Sanson Hosiery Mills, Inc., v. Warren Knitting Mills, Inc., 3 Cir., 202 F.2d 395.

16. Glen Raven Knitting Mills, Inc., v. Sanson Hosiery Mills, Inc., 4 Cir., 189 F. 2d 845.

the lamb but a neck ribbon has been substituted. In my opinion, these three minor differences manifestly do not avoid infringement.[17] Little further need be said on the subject of infringement. At least so far as the duck, rabbit, and squirrel are concerned, defendant frankly admits infringement and attempts to justify its action in so infringing by the argument that "It is only by becoming an infringer that one gains opportunity to assail a patent in his own interest and that of the public."[18] Of course, the chief reason was, as defendant itself admits, they were copied because they were selling well and "in order to satisfy the public demand for novel and more intriguing figures."[19] (Dunlop Deposition, Page 52.)

Having in mind defendant's alleged concern in regard to "the public interest", the cold fact remains that actually Palmer's designs were copied because they were selling well and that they were satisfying the public demands for novel and more intriguing figures, as defendant frankly admits in his brief and which admission is predicated upon testimony of its own witnesses.

It is, therefore, my opinion that the defendant has infringed all four of plaintiff's design patents.

Finally, as to the charge of unfair competition. In Q-Tips, Inc., v. Johnson & Johnson, 3 Cir., 206 F.2d 144, 145, Judge Goodrich quoted approvingly from Restatement, Torts, Volume III, Page 540, as follows:

"It is worth pointing out, at the start of our discussion, that we are in a field where the tendency of the law 'has been in the direction of enforcing increasingly higher standards of fairness or commercial morality in trade. The tendency still persists.'"

By the same token defendant's conduct[20] does not meet with the approval of this Court, as was indicated by the Court at the time of the trial.[21] On the other hand, there are certain basic requirements in the law of unfair competition.

■ In this type of case there is ever present the necessity for proof that the public desire is for a product made by the plaintiff in distinction to a desire for a product for which the plaintiff has created the demand. In discussing this requirement, Judge Learned Hand in Crescent Tool Co. v. Kilborn & Bishop Co., 2 Cir., 247 F. 299, 300, stated, inter alia:

"* * * Therefore it is apparent that it is an absolute condition to any relief whatever that the plaintiff in such cases show that the appearance of his wares has in fact come to mean that some particular person—the plaintiff may not be individually known—makes them, and that the public cares who does make them, and not merely for their appearance and structure. * * * The critical question of fact at the outset always is whether the public is moved in any degree to buy the article because of its source and what are the features by which it distinguishes that source. Unless the plaintiff can answer this question he can take no step forward; no degree of imitation of details is actionable in its absence."

The same thought was expressed by the court in Gum, Inc., v. Gumakers of

17. Florence-Mayo Nuway Co. v. Hardy, 4 Cir., 168 F.2d 778, 784.

18. United States Gypsum Co. v. Consolidated Expanded Metal Companies, 6 Cir., 130 F.2d 888, 890.

19. As a matter of fact, according to the deposition of George W. Dunlop, Vice President of Luden's, Inc., in charge of sales, Luden's did not embark on the manufacture of hollow chocolate lambs and squirrels until 1951.

20. Inter alia, slavish copy of designs, reduction in weight content of rabbit and squirrel which did not result in perceptible reduction in size but was sold for less, and imitation of container.

21. Transcript of Proceedings, Pages 73, 74.

America, Inc., 3 Cir., 136 F.2d 957, 958, as follows:

"Aside from the prohibition against infringing a patent, copyright or trade mark and except for the requirement, * * * that he must identify his product as his own, any one has the right to manufacture and sell a product similar or even identical in appearance to the original product with which it competes unless the original product has become associated in the public mind with its producer. * * *"

In the instant case there is no evidence that the public purchased the goods in question on the basis of who made them; they were purchased on the basis of their "new, original and ornamental" appearance heretofore discussed.

For the reasons stated, plaintiff is entitled to no relief on the grounds of unfair competition.

Findings of fact were submitted in compliance with the Court's request. Such findings as were found to be appropriate and satisfactory and in conformity with the above discussion were adopted and included in the following

Findings of Fact

1. Plaintiff, R. M. Palmer Company, is a corporation organized and existing under the laws of the State of Pennsylvania.

2. Defendant, Luden's, Inc., is a corporation organized and existing under the laws of the State of Pennsylvania.

3. Plaintiff and defendant are competitors in the production and sale of hollow chocolate candy animal figures.

4. Plaintiff is the owner by assignment of United States Design Patents Nos. 157,621, 161,521, 161,522 and 161,865, hereinafter called the "Palmer" patents, covering respectively, designs for a chocolate rabbit, a chocolate duck, a chocolate lamb and a chocolate squirrel.

5. The Palmer patents originally issued to the inventor thereof, Richard M. Palmer, who assigned said patents by written assignment, together with all claims for profits and damages arising out of the past infringement thereof, to plaintiff on October 18, 1951.

6. The controversy between the parties involves the validity of the Palmer patents, and the question of infringement thereof and of unfair competition by defendant.

7. The chocolate figures in evidence as plaintiff's exhibits 10 to 16 inclusive are representative of the chocolate figures manufactured and sold by plaintiff under the Palmer patents.

8. The chocolate figures in evidence as plaintiff's exhibits 5 to 9 inclusive are representative of the accused chocolate figures made and sold by defendant.

9. Plaintiff and its predecessor, Richard M. Palmer, have marked the various chocolate figures made and sold by them under the Palmer patents with an inscription bearing the number of the particular patent under which each chocolate figure is manufactured.

10. Until chocolate figures embodying the designs of the Palmer patents in suit appeared on the market in 1949, all of the chocolate figures manufactured and sold by the confectionery industry involved the so-called "standard" designs which had originated from abroad. These old, long-used designs evidenced little more than uninspired attempts to reproduce natural life-like poses; they were wholly lacking in imaginative quality. When the Palmer designs entered the field, there was a compelling need in the industry for unique and intriguing figures with expressions and dress in caricature which would revive the public interest and fancy and appeal to the imagination of children.

11. The Palmer chocolate figures have been very successful, and their success is due to the merit of the new designs. Without the aid of a sales force, with no advertising and beginning with only six employees, plaintiff immediately enjoyed a sizeable and ever expanding business in the manufacture and sale of the patented chocolate figures. Its

business in the manufacture and sale of the patented chocolate figures has from the beginning shown a substantial increase in sales year after year; during the period from 1949 to 1953 plaintiff's sales of its rabbit design alone jumped from 18,233 dozen pieces per year to 138,-280 dozen pieces per year. Plaintiff's sales of its duck, lamb and squirrel figures have similarly increased from year to year.

12. The prior design patents and publications offered in evidence by defendant disclose designs which are altogether different in their general overall appearance from the designs of the Palmer patents.

13. The designing of chocolate figures for the confectionery trade requires a combination of skills altogether different from that involved in the designing of toys and novelties made of plastic, rubber, ceramic and other non-brittle materials. In view of the limitations imposed by the manufacturing process and by the brittleness of the figures, a designer of chocolate figures is faced with severe handicaps in attempting to produce new and ornamental designs.

14. The inventor of the Palmer designs in suit, Richard M. Palmer, in producing the design here in suit, succeeded in overcoming the handicaps and difficulties inherent in the designing of new and ornamental designs for chocolate figures. As shown by the prior art of record, Palmer's creations were non-obvious at the time they were made and exhibit a designing skill beyond the ordinary skill of this art.

15. Defendant admittedly knew of the Palmer designs and of their success when it began to manufacture and sell its accused chocolate figures. Defendant's selection of the accused designs was stimulated by its knowledge that the Palmer designs were selling well and by its desire to copy them "in order to satisfy the public demand for novel and more intriguing figures."

16. In copying the Palmer designs, defendant not only copied the sizes, shapes, contours and general proportions thereof, but extended its copying to a slavish imitation of the minute details thereof.

17. When viewed at the distance at which chocolate figures are ordinarily observed in the trade, defendant's figures are indistinguishable from the designs of the Palmer patents in suit. Even when carefully scrutinized on a much closer view, such differences as exist are minute and inconsequential. The overall effect upon the eye of the patented and the accused designs is the same; the aesthetic effect is one of identity.

18. The chocolate figures sold by plaintiff have been sold continuously in packages exemplified by plaintiff's exhibits 10 to 16 inclusive. No changes or variations of any significance have occurred in the designs or dress of plaintiff's chocolate figures or of the packages in which they are sold.

19. Defendant, in addition to copying the chocolate figures themselves, has also closely simulated most of the identifying features characteristic of plaintiff's packaging. Specifically, defendant has copied the style and shape of plaintiff's packages, including the yellow inserts for the large and small rabbits, the manner in which such inserts are incorporated in the packages and the special form of "wrap-around" cellophane window that is characteristic of all of the Palmer packages. The various features so copied by defendant are purely arbitrary features of plaintiff's products; they are in no way features of utility.

20. There is no evidence in the case that the public was moved in any degree to buy the goods in question because of their source.

## Conclusions of Law

1. This Court has jurisdiction over the subject matter and over the parties.

2. Plaintiff has good and valid title to the patents in suit.

3. The patents in suit were legally issued and are valid, unexpired and enforceable.

4. The chocolate figures made and sold by defendant and exemplified by plaintiff's exhibits 4 to 9 inclusive constitute an infringement of the patents in suit.

5. The patents in suit are not anticipated nor negatived by any of the prior patents or publications cited or relied upon by defendant.

6. Defendant is not guilty of unfair competition with plaintiff.

### Damages

In conformity with the above findings of fact and conclusions of law, plaintiff is entitled to,

1. Injunctive relief.[22]

2. Compensatory damages for patent infringement.[23]

3. Reasonable attorneys' fees.[24]

An order of reference to a master will be withheld for the present pending the finality of judgment and decree.

Form of judgment and decree may be submitted in accordance with the foregoing.

22. 35 U.S.C. § 283.

23. 35 U.S.C. § 284.

24. 35 U.S.C. § 285.