**R. M. PALMER COMPANY**

v.

**LUDEN'S, Inc., Appellant.**

No. 11652.

United States Court of Appeals Third Circuit.

Argued Dec. 6, 1955.

Reargued April 10, 1956.

Decided Aug. 22, 1956.

Kennard N. Ware, Philadelphia, Pa. (Howson & Howson, Philadelphia, Pa., on the brief), for appellant.

Henry N. Paul, Jr., Philadelphia, Pa. (Robert B. Frailey, Paul & Paul, Philadelphia, Pa., on the brief), for appellee.

Before BIGGS, Chief Judge, and MARIS, GOODRICH, McLAUGHLIN, KALODNER, STALEY and HASTIE, Circuit Judges.

KALODNER, Circuit Judge.

The R. M. Palmer Company, a Pennsylvania corporation, brought this action against Luden's, Inc., also a Pennsylvania corporation, charging infringement of four design patents covering chocolate novelties in the form of a rabbit, a duck, a squirrel and a lamb,[1] and further charging unfair competition. The defendant denied infringement and unfair competition, and attacked the validity of the design patents. The District Court found the patents valid and infringed, and allowed the recovery of counsel fees, but found against the plaintiff on its charge of unfair competition. D.C.E.D.Pa.1955, 128 F.Supp. 672. The defendant prosecuted this appeal.

The defendant does not here assert non-infringement, but contends that the District Court erred in sustaining the validity of the four design patents involved and in awarding counsel fees to the plaintiff. The questions are thus confined. It should be noted, too, that on the issue of validity, the defendant relies upon the failure of the designs to evince invention over the prior art, rather than upon anticipation.

The facts are not substantially in dispute. As found by the District Court, they are as follows:

Richard M. Palmer, the patentee and assignor of the plaintiff, started in the candy business on a small scale in 1948, in Reading, Pennsylvania, where the defendant, a large and well-established candy manufacturer has its offices and plant. Prior to 1948, hollow chocolate standard or conventional figures were produced by the defendant, principally from imported German molds known as "Reiche" molds, so-called after the manufacturer. These molds, of animals, were "realistic" in concept, following natural proportions and postures. Because of the war, with limitations on uses of chocolate and impossibility of importation, the industry, at least insofar as we are concerned, endured non-production, at least until some time in 1946. After 1946, the former distributor of "Reiche" molds, commenced to manufacture its own molds continuing a selected number of the more popular "Reiche" figures. It is clear that the hollow chocolate candy art was, at the time Palmer entered it, "old-fashioned", "stagnant" and "lagging", to use the defendant's terms.

The figures developed by Palmer are fanciful, decorated productions of the animals involved, cast in hollow chocolate, with exaggerated features. They might be described as ornamented caricatures. The record suggests difficulty of design attributable to the frailty of

---

1. Design Patent No. 157,621, March 7, 1950, consisting of a chocolate rabbit; Design Patent No. 161,521, January 2, 1951, consisting of a chocolate duck; Design Patent No. 161,522, January 2, 1951, consisting of a chocolate lamb; Design Patent No. 161,865, February 6, 1951, consisting of a chocolate squirrel.

the medium and to the manufacturing technique. In the Easter season, which is the trade objective of this kind of product, Palmer's figures met with "marked success",[2] again using the defendant's term. It was for this reason that the defendant included the items in its line of confections.

Unquestionably, Palmer awakened the industry to a new satisfaction of a long felt need. The defendant, whose counsel have demonstrated laudable candor, does not seek to detract from what it calls the good judgment, ability and acumen of Palmer. Nor does it seek to detract from fancifulness, attractiveness and appeal of the designs. Nevertheless, it maintains that there is not such novelty as warrants patent protection, and that the designs evidence only the expected skill of a good craftsman, which does not rise to the dignity of invention.

The District Court found that the designs were new and different; that they were non-obvious at the time they were made; that they were the result of inventive faculty, exhibiting a designing skill beyond the ordinary skill of the art.

 The plaintiff came to the District Court with the benefit of the presumption of validity. The defendant did not rely upon prior patents different from those considered by the Patent Office. The defendant comes to this Court with the burden of convincing us that the District Court's findings, to the extent they are findings of fact, are clearly erroneous. United States v. United States Gypsum Co., 1948, 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746.

It is our opinion that the judgment of the District Court ought not to be set aside.

In the field of judicial testing of the validity of patents, it is a common observation that the law is settled, the difficulty existing in its application. Here, the plaintiff has introduced an argument as to the effect of the Patent Act of 1952, 35 U.S.C., 1952 ed., Section 1 et seq. The argument presupposes that the courts, as a result of the "flash of genius" expression in Cuno Engineering Corp. v. Automatic Devices Corp., 1941, 314 U.S. 84, 91, 62 S.Ct. 37, 86 L.Ed. 58, have applied a higher, more rigid standard for determining validity, and that the recent Act, 35 U.S.C., 1952 ed., Section 103,[3] constitutes a congressional change of direction to assertedly more lenient criteria. Notwithstanding that the plaintiff rests upon the conclusion of the District Court that the design patents involved meet the requirements of the new Act, the issue raised merits attention.[4]

---

2. In the Easter season of 1949, plaintiff sold 18,233 dozens of the rabbit and 138,280 dozens in 1953; in 1950, it sold 13,000 dozens of the duck, and 29,000 in 1953; in 1951, it sold 14,000 dozens of the lamb and 35,000 dozens of the squirrel, and 36,000 dozens of the lamb and 58,000 dozens of the squirrel in 1953.

3. Section 103, 35 U.S.C., 1952 ed., is made applicable to design patents by virtue of Section 171, which reads as follows:
 "§ 171. Patents for designs
 "Whoever invents any new, original and ornamental design for an article of manufacture may obtain a patent therefor, subject to the conditions and requirements of this title...
 "The provisions of this title relating to patents for inventions shall apply to patents for designs, except as otherwise provided."
 This is based upon 35 U.S.C., 1946 ed., Section 73. The law was, and is, that invention is as necessary in design patents as in utility patents. Smith v. Whitman, 1893, 148 U.S. 674, 13 S.Ct. 768, 37 L.Ed. 606; S. Dresner & Son, Inc., v. Doppelt, 7 Cir., 1941, 120 F.2d 50, 52.
 Section 103, 35 U.S.C., 1952 ed., reads as follows:
 "§ 103. Conditions for patentability; non-obvious subject matter
 "A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made."

4. Wasserman v. Burgess & Blacher Co., 1 Cir., 1954, 217 F.2d 402, 404; Lyon v. Bausch & Lomb Optical Co., 2 Cir., 1955,

■ The provisions of Section 103, 35 U.S.C., 1952 ed., as set forth in footnote 3, are new. The purpose of the provisions as stated by the Reviser is to achieve a stabilizing effect, and to render immaterial whether the invention resulted from "flash of genius".[5]

It is, perhaps, rather strong language to say that the new Act changed the law of patentability. The choice of language in the Act indicates, as the legislative history discloses, an attempt to state what the law has been. As such, it is a codification. The difficulty always existed in the application of the law, because to a large extent the standards have been indefinite and subjective. And judicial attempts to improvise expressions covering that which had been said many times before account for numerous descriptive phrasings of an elusive concept. The Act was intended to achieve the objective of stabilizing the law through legislative expression which becomes the touchstone of the decisions. Nor is it likely that a constitutional problem will arise so long as the expected interpretations of the statute come within the boundaries of long standing judicial declarations of the content of patentability. To what extent a change is wrought would seem to depend upon the pre-existing views of a tribunal as to the standard upon which it has determined patentability.[6] As pointed out by Judge Learned Hand in

224 F.2d 530, 535-536, certiorari denied 350 U.S. 911, 76 S.Ct. 193; Interstate Rubber Products Corp. v. Radiator Specialty Co., Inc., 4 Cir., 1954, 214 F.2d 546, 549; Vincent v. Suni-Citrus Products Co., 5 Cir., 1954, 215 F.2d 305, 315; General Motors Corp. v. Estate Stove Co., 6 Cir., 1953, 203 F.2d 912, 915; Helms Products, Inc., v. Lake Shore Manufacturing Co., 7 Cir., 1955, 227 F. 2d 677, 682-683; Pacific Contact Laboratories, Inc., v. Solex Laboratories, Inc., 9 Cir., 1953, 209 F.2d 529, 533; L-O-F Glass Fibers Co. v. Watson, D.C. Cir.1955, 228 F.2d 40, 47; and also our own references to the new Act: Stanley Works v. Rockwell Mfg. Co., 3 Cir., 1953, 203 F.2d 846, 849; Mojonnier Bros. Co., Inc. v. Tolan Machinery Co., Inc., 3 Cir., 1956, 230 F.2d 850, 851; see also, Gagnier Fibre Products Co. v. Fourslides, Inc., D.C.E.D.Mich.1953, 112 F. Supp. 926; Thys Co. v. Oeste, D.C.N.D. Cal.1953, 111 F.Supp. 665, 673, 674, affirmed per curiam, Thys Co. v. Anglo California Nat. Bank, 9 Cir., 1955, 219 F.2d 131.

5. "There is no provision corresponding to the first sentence explicitly stated in the present statutes, but the refusal of patents by the Patent Office, and the holding of patents invalid by the courts, on the ground of lack of invention or lack of patentable novelty has been followed since at least as early as 1850. This paragraph is added with the view that an explicit statement in the statute may have some stabilizing effect, and also to serve as a basis for the addition at a later time of some criteria which may be worked out.

"The second sentence states that patentability as to this requirement is not to be negatived by the manner in which the invention was made, that is, it is immaterial whether it resulted from long toil and experimentation or from a flash of genius."

See also, House Report No. 1923, (May 12, 1952) and Senate Report No. 1979, June 27, 1952 (both 82d Cong. 2d Sess.):

"Section 103, for the first time in our statute, provides a condition which exists in the law and has existed for more than 100 years, but only by reason of decisions of the courts. An invention which has been made, and which is new in the sense that the same thing has not been made before, may still not be patentable if the difference between the new thing and what was known before is not considered sufficiently great to warrant a patent. That has been expressed in a large variety of ways in decisions of the courts and in writing. Section 103 states this requirement in the title. It refers to the difference between the subject matter sought to be patented and the prior art, meaning what was known before as described in Section 102. If this difference is such that the subject matter as a whole would have been obvious at the time to a person skilled in the art, then the subject matter cannot be patented.

"That provision paraphrases language which has often been used in decisions of the courts, and the section is added to the statute for uniformity and definiteness. This section should have a stabilizing effect and minimize great departures which have appeared in some cases."

6. See Anderson Co. v. Lion Products Co., 1 Cir., 1942, 127 F.2d 454, 457; Bel-

Lyon v. Bausch & Lomb Optical Co., 2 Cir., 1955, 224 F.2d 530, 535–536, certiorari denied 350 U.S. 911, 76 S.Ct. 193, despite adherence to the keystone cases, like Hotchkiss v. Greenwood, 11 How. 248, 13 L.Ed. 683 intangible elements have directed judicial attitudes to "misgiving about the increased facility with which patents were being granted."

We are inclined to accept the sensitive observations of Judge Learned Hand as to the judicial tendency of recent years, even within the language of the older decisions, to expect an indefinite "more" of the proffered invention. The Act reaffirms the presumptive validity of patents (35 U.S.C., 1952 ed., Section 282), and specifies patentability in terms with which all in the field are familiar. It would appear that in this context, and by this choice of terms, the intended stabilizing effect is sought to be achieved. Beyond this, the tribunal faced with an issue of validity is left to the struggle to determine upon which side of a vague boundary line it will place the alleged invention. E.g. Jungersen v. Ostby & Barton Co., 1949, 335 U.S. 560, and dissenting opinions at 568 and 571, 69 S.Ct. 269, 273 and 274, 93 L.Ed. 235. There is no longer any doubt that the "flash of genius" has been laid to rest.

The specifications for the granting of a design patent, as set forth in the Act are invention of a new, original and ornamental design non-obvious to a person of ordinary skill in the art. In Gorham v. White, 1872, 14 Wall. 511, 525, 20 L.Ed. 731, an infringement case, the Supreme Court emphasized that

"it is the appearance itself * * * that constitutes mainly, if not entirely, the contribution to the public

which the law deems worthy of recompense. The appearance may be the result of peculiarity of configuration or of ornament alone, or of both co-jointly, but in whatever way it is produced, it is the new thing or product which the patent law regards."

And in Glen Raven Knitting Mills v. Sanson Hosiery Mills, 4 Cir., 1951, 189 F.2d 845, 850–852, the law was fairly summarized:

"Later cases developed the standards to be used when the validity of a design patent was at issue. Validity is to be tested by the appearance of the patented design as a whole. Dobson v. Dornan, 118 U.S. 10, 15, 6 S.Ct. 946, 30 L.Ed. 63. 'A combination of elements that are old is patentable, if it produces a new and useful result as the product of the combination; and a design which avails itself of suggestions old in art is patentable, if as a whole, it produces a new and pleasing impression on the aesthetic sense.' Matthews & Willard Mfg. Co. v. American Lamp & Brass Co., 3 Cir., 103 F. 634, 639. Nevertheless, there must be an exercise of the inventive faculty, and if the design lacks this quality, it will not suffice to say that it is new, original and ornamental, and has received wide public acceptance. Smith v. Whitman Saddle Co., 148 U.S. 674, 13 S.Ct. 768, 37 L.Ed. 606; S. Dresner & Son v. Doppelt, 7 Cir., 120 F.2d 50; * * *. 'In short, the test is whether the design involved "a step beyond the prior art requiring what is termed 'inventive genius'"." General Time Instrument Corp. v. United States

lavance v. Frank Morrow Co., 1 Cir., 1944, 140 F.2d 419, 423; Brown & Sharp Mfg. Co. v. Kar Engineering Co., 1 Cir., 1946, 154 F.2d 48, 51; Weidhaas v. Loew's, Inc., 2 Cir., 1942, 125 F. 2d 544, 545; Foxboro Co. v. Taylor Instrument Co., 2 Cir., 1946, 157 F.2d 226, 234; Robertson Rock Bit Co. v. Hughes Tool Co., 5 Cir., 1949, 176 F.2d 783, 790; Trabon Engineering Corp. v.

Dirkes, 6 Cir., 1943, 136 F.2d 24, 27; Falkenberg v. Bernard Edward Co., 7 Cir., 1949, 175 F.2d 427, 428–429; Alemite Co. v. Jiffy Lubricator Co., 8 Cir., 1949, 176 F.2d 444, 448–449; Trico Products Corp. v. Delman Corp., 8 Cir., 1950, 180 F.2d 529, 533–534, and compare with the decisions cited in footnote 4, supra.

Time Corp., 2 Cir., 165 F.2d 853, 854."

The Court further indicated, 189 F.2d at page 853, the special importance of commercial success in determining the validity of the design patent. See Sanson Hosiery Mills, Inc., v. Warren Knitting Mills, Inc., 3 Cir., 1953, 202 F.2d 395, 396; J. R. Wood & Sons, Inc., v. Abelson's, Inc., 3 Cir., 1934, 74 F.2d 895.

██ It is almost unavoidable that the visual sense is the primary testing ground, and that the design must be looked at as a whole. We are of the opinion that the designs in this instance disclose artistic treatment in form and configuration, creating a pleasing impression and substantially different aesthetic effect. We are of the opinion, further, that they reflect originality born of inventive faculty. While the defendant offered numerous publications showing a variety of novelty designs, none meet the visual test, to detract from the impressions left by Palmer's designs. What the defendant sought to show was the state of the art, but the difficulty lies in the fact that while arms, legs, and various other parts of the body and ornamentations are necessary parts of the Palmer configurations, it is the whole upon which decision must be based. The defendant insists that the "Walt Disney" forms make Palmer's designs nothing other than the work of a skillful craftsman. In essence, however, the defendant's argument is that the idea of the "Walt Disney" type of product is old, so that any figure or design is merely a variation which does not involve invention. Reliance is placed upon Knickerbocker Plastic Co. v. Allied Molding Corp., 2 Cir., 1950, 184 F.2d 652. But the Court there did not hold that the design involved was unpatentable merely because it was within the field of unnatural, grotesque figures. Rather, it concluded that the features of the design in dispute were "pretty substantially duplicated in one or more of the four Disney ducks. Even if they were not, the Disney product had so popularized the not too unusual idea of a grotesque animal design for this particular fowl that more than this type of change would appear to be needed to show invention." It is apparent that the Court did not consider the whole field of exaggerated animal figures to have been preempted by the idea alone, and that the design in dispute failed of patentability because it did not get out from Disney's shadow, as the Court put it.

We conclude, therefore, that the District Court did not err in holding Palmer's design patents valid. There is no question that they were infringed.

██ Finally, the defendant disputes the correctness of awarding counsel fees to the plaintiff. The 1952 Patent Act, in Section 285,[7] continues the discretionary power of the District Court to award reasonable counsel fees in exceptional cases. The phrase "exceptional circumstance" is not contained in the prior law (35 U.S.C., 1946 ed., Sec. 70), but confirms to the interpretation of the prior law by the cases. It is clear that counsel fees should not be awarded as a matter of course, nor as a penalty against the loser who followed conventional procedure. Jacquard Knitting Mach. Co. v. Ordnance Gauge Co., 3 Cir., 1954, 213 F.2d 503, 508–509; Pennsylvania Crusher Co. v. Bethlehem Steel Co., 3 Cir., 1951, 193 F.2d 445, 450–451; Park-In Theatres v. Perkins, 9 Cir., 1951, 190 F.2d 137, 142–143; Dubil v. Rayford Camp & Co., 9 Cir., 1950, 184 F.2d 899, 902–903. The exercise of discretion in favor of the allowance should be "bottomed upon a finding of unfairness or bad faith in the conduct of the losing party, or some other equitable consideration of similar force, which makes it grossly unjust that the winner of the particular law suit be left to bear the burden of his own counsel fees which prevailing litigants nor-

7. "§ 285. Attorneys fees. The court in exceptional cases may award reasonable attorney fees to the prevailing party."

mally bear." Park-In Theatres v. Perkins, supra, 190 F.2d at page 142.

Here, as in Pennsylvania Crusher Co. v. Bethlehem Steel Co., supra, there is no finding of the District Court which would bring the case within the reasons for granting the award. The District Court did find, generally, that the defendant copied the plaintiff's designs because of their success. But it appears to us that this is remedied by the award of damages for infringement. Otherwise, nothing gives support to any equitable consideration for the allowance of counsel fees, and plaintiff makes no claim.

For the reasons stated, the judgment of the District Court will be affirmed, except insofar as it allows counsel fees to the plaintiff.

HASTIE, Circuit Judge (dissenting).

I think the district court's finding of invention in this case was clearly erroneous. We all agree that, in the language of the majority opinion, "the granting of a design patent * * * [must be based upon] invention of a new, original and ornamental design non-obvious to a person of ordinary skill in the art." My disagreement is based upon the belief that plaintiff's design cannot be reasonably said to meet that standard. The Disney figures and many other prior art caricatures of rabbits, ducks, squirrels and lambs were before the district court and are before us. In one or two cases plaintiff's design approximates earlier figures almost as closely as would a copy. All of plaintiff's designs are so similar to earlier caricatures as to suggest that what plaintiff has done would necessarily be obvious to any draftsman familiar with recent developments in that field; and the record contains no testimony, expert or otherwise, to indicate any distinctive characteristics differentiating plaintiff's designs significantly from other familiar caricatures of the same animals.

In this view of the matter I cannot see how plaintiff's figures can reasonably be said to exhibit inventive variation from what was already familiar. It seems to me—and I think plaintiff's testimony is to the same effect—that what plaintiff contributed here was a very good merchandising idea, namely, that caricatures of animals such as had proved attractive in other fields would also make edible chocolate animals sell better. But the reduction of that idea to practice was not invention.

I would reverse the judgment.