AMERICAN SIGN AND INDICATOR CORPORATION, Plaintiff-Appellant,

v.

Edward J. SCHULENBURG et al., etc., Defendants-Appellees.

TIME–O–MATIC, INC., Plaintiff-Appellee,

v.

AMERICAN SIGN AND INDICATOR CORPORATION, Defendant-Appellant.

TIME–O–MATIC, INC., Plaintiff-Appellant,

v.

AMERICAN SIGN AND INDICATOR CORPORATION, Defendant-Appellee.

Nos. 12509–12511.

United States Court of Appeals Seventh Circuit.

June 3, 1959.

Rehearing Denied July 9, 1959.

Wilfred S. Stone, Chicago, Ill., Cameron Sherwood, Walla Walla, Wash., Henry S. Wise, Danville, Ill., for American Sign & Indicator.

Charles B. Spangenberg, Chicago, Ill., Donald S. Baldwin, Danville, Ill., Sidney Wallenstein, Chicago, Ill., for Schulenburg, Time-O-Matic.

Before SCHNACKENBERG, HASTINGS, and KNOCH, Circuit Judges.

KNOCH, Circuit Judge.

The following issues were presented to the District Court in this cause:

(1) Was there an oral contract between Williams Brothers, Inc. and Time-O-Matic Company (hereinafter called "TOM Co") whereby the latter was to manufacture and sell exclusively to Williams Brothers, Inc., equipment for displaying time and temperature on a single panel of lights, and whereby Williams Brothers, Inc., was to purchase all equipment for these signs from TOM Co?

(2) Was there a confidential relationship between TOM Co and American Sign and Indicator Corporation (hereinafter called "ASI") and Williams Brothers, Inc.?

(3) Is Patent No. 2,673,976 (owned by ASI) valid? Are TOM Co and its successor Time-O-Matic, Inc., (hereinafter called "TOM") estopped to deny its validity?

(4) If the patent is valid was it infringed?

(5) If ASI has failed to establish the oral contract or the confidential relationship, and the patent is invalid, is TOM entitled on the basis of unfair competition, to damages and to restrain ASI from interfering with the sale of its equipment for displaying time and temperature on a single bank of lamps?[1]

On or about August 17, 1956, TOM had sought declaratory judgment that the patent in suit was invalid and not infringed. TOM also sought to restrain alleged unfair competition by ASI and prayed damages therefor. ASI filed suit on or about October 31, 1956, against Edward J. Schulenburg, Edward J. Schulenburg, Jr., Helen E. Schulenburg, and Marie V. Pottebaum, partners operating under the name of TOM Co and its successor TOM, to recover damages for breach of alleged oral contract and confidential relationship, in addition to injunction and accounting for damages from patent infringement. The two causes were consolidated.

The District Court found the patent invalid, and found no such contract or confidential relationship between the parties as alleged by ASI in its complaint. The District Court, therefore, enjoined ASI from charging TOM or its customers with infringement of the patent. In addition, the District Court found no unfair competition on the part of ASI as complained of by TOM, and denied injunction. Both ASI and TOM appealed.

A brief survey of the factual situation giving rise to these actions will be helpful. This Court may not set aside the findings of fact of the District Court unless we find them clearly erroneous. Rule 52(a), Federal Rules of Civil Procedure, 28 U.S.C.A.; Hyster Co. v. Hunt Foods, Inc., 7 Cir., 1959, 263 F.2d 130, 133; Simmons Co. v. A. Brandwein & Co., 7 Cir., 1957, 250 F.2d 440, 445.

In 1949, Charles and Luke Williams, partners in the business of cleaning, painting, selling and installing neon signs organized Williams Brothers, Inc., a corporation of the State of Washington.

During the month of May, 1952, the Williams Brothers incorporated ASI (al-

---

[1] Adopted from the excellent opinion of Judge Casper Platt which has been substantially followed by this Court.

so in the State of Washington, with places of business in Spokane, Washington, and Chicago, Illinois) to sell a sign alternately displaying time and temperature on a single bank of lights, or on one reading panel.

TOM Co, in Danville, Illinois, for a number of years was a manufacturer and seller of control equipment for signs.

Northwestern Agencies, Inc., in Seattle, Washington, was TOM Co's distributor or manufacturer's representative in the Pacific Northwest. Coastal Sales Co., at Seattle and Spokane, Washington, was TOM Co's jobber or sign supply house. Both sold electrical equipment for other manufacturers as well.

The Williams brothers knew that TOM Co had for many years been selling electrical control equipment for signs displaying time and temperature separately. On or about May 23, 1951, Charles Williams telephoned J. W. Sutphin, TOM Co's Sales Manager. Charles Williams asked if TOM Co could build and supply control equipment to display time and temperature alternately on a single bank of lights, and at what price. Sutphin, in this telephone conversation, in the hearing of W. E. Bachman, TOM Co's specifications engineer, stated that TOM Co could supply the equipment, but that he would have to figure out the means and price.

The District Court found that Charles Willliams disclosed no details or plan of accomplishing the desired end result. Charles Williams had no drawings or details for use of the mechanisms. The idea of the single bank display was not a trade secret, nor was it confidentially disclosed to TOM Co at this or any other time. Nor had TOM Co solicited the idea.

After consultation with Sutphin and Donald Banks in TOM Co's engineering department, Bachman wrote Charles Williams May 25, 1951, quoting standard list prices for one numeral clock mechanism at $880, one numeral thermometer control at $1,980, and estimated cost of one relay panel for switching

the lamp bank alternately from clock mechanism to thermometer control at $600. No charge for engineering was included. He enclosed sketches of the composite lamp bank and numeral styles for a lamp bank, together with explanation for placing lamps in a composite lamp bank, and photographs of the time and temperature controls.

On or about June 26, 1951, the Williams brothers gave Greek Wells, patent attorney, photostats of a proposed sign design for the Spokane and Eastern Branch of the Seattle First National Bank, Spokane, Washington, including alternate display of time and temperature on a single bank of lamps. Application for copyrighting the sign design was received in the United States Copyright Office July 3, 1951, and copyright was registered July 31, 1951. The idea and the design were thus published more than one year prior to the filing of application for the patent on December 19, 1952. Wells' sketch allegedly made in June, 1951, discloses no wiring, details of mechanisms, nor use of lifter bars. The District Court found that E. J. Schulenburg, TOM Co's manager, (who was away from the factory when Charles Williams telephoned and Bachman wrote on May 25, 1951), later suggested lifter bars instead of the relay panel.

On or about June 27, 1951, Williams Brothers, Inc. presented the Spokane and Eastern Bank with the completed sketch of the proposed sign, and under date of July 10, 1951, wrote the Bank that this would be the only known unit displaying correct time and temperature alternately from the same reader panel. At the Williams brothers' request, Sutphin sent the Williams brothers a letter dated August 31, 1951, stating that TOM Co had "never furnished equipment for a combination time and temperature indication" * * * "from a common, composite lamp bank."

In September, 1951, when the Williams brothers requested Wells to file application for a patent, they had no sketches or diagrams for accomplishing

alternate display of time and temperature.

At a meeting, on or about September 21, 1951, in Seattle, Washington, where the proposed sign for the Bank was discussed, Schulenburg instructed the Williams brothers in construction of the lamp bank, placement of lamps on the sign, location of the control thermometer and operation of the equipment TOM Co would furnish.

The District Court found that the Williams brothers made no effort to treat the proposed sign as a confidential disclosure, and that there was no oral understanding or agreement, express or implied, that Williams Brothers, Inc. would purchase all its control equipment for the alternate display signs from TOM Co or that TOM Co would sell such equipment solely to Williams Brothers, Inc., although Schulenburg did state TOM Co would refer inquiries to Williams Brothers, Inc.

On or about September 26, 1951, without TOM Co's knowledge, Williams Brothers, Inc. guaranteed the Bank exclusive use of the alternate display sign on the strength of an alleged "patent pending". No patent application had yet been filed.

About October 19, 1951, Williams Brothers, Inc. ordered control equipment for the Bank's proposed sign from Coastal Sales Company, which, in turn, placed its order with TOM Co about October 25, 1951.

TOM Co's employees planned the wiring and use of lifter bars (as suggested by Schulenburg in place of the originally quoted relay panel) on the numeral clock and numeral thermometer control mechanism under the control of its flasher to produce the alternate display of time and temperature. The control equipment was built by TOM Co in Danville, Illinois, and shipped December 12, 1951, to Williams Brothers, Inc.

It arrived in Spokane, about December 15, 1951, in separate units, with complete wiring diagrams and instructions. The Williams brothers had built the cabinet and the lamp bank, having obtained the information on how to lay out the lamp bank from TOM Co. The Williams brothers had sold, repaired, and assembled signs, but they had never manufactured or assembled any of these units. With the aid of an employee and using the diagrams and instructions from TOM Co, they mounted the control equipment units in the cabinet, wired them together and to the lamp bank. The sign was put into operation on December 27, 1951.

By letter dated December 11, 1951, Sutphin stated that inquiries on the equipment for alternate time and temperature display would be referred to Williams Brothers, Inc. In 1952, ASI was organized and TOM Co referred inquiries to ASI.

Frequent correspondence between the Williams brothers, ASI and TOM Co in repeated, unsuccessful attempts to persuade TOM Co to enter an exclusive buyer and seller agreement, clearly negates the existence of such an agreement between them. The actions of the parties were inconsistent with the existence of such agreement. Williams Brothers, Inc., and ASI made no objection when TOM Co sold control equipment to Electrical Products Consolidated which installed it in a Denver, Colorado, bank. Charles Williams acknowledged with appreciation Schulenburg's letter notifying him of Electrical Products Consolidated's inquiry. TOM Co made no objection when informed that ASI was purchasing control equipment elsewhere and was substituting relays purchased elsewhere for lifter bars.

The patent issued March 30, 1954, to Charles and Luke Williams as the alleged inventors, who assigned all their rights under the patent to ASI. The patent covered the use of lifter bars and not relays as were then being used by ASI.

The record shows discussion and correspondence between ASI and TOM Co concerning competition from International Business Machines. At one time ASI had negotiated with International Business Machines to use its control

equipment in place of TOM Co equipment. About May 4, 1956, Schulenburg was insisting ASI sell signs to various companies, or TOM Co would develop and market alternating time and temperature control equipment to the sign trade, to meet IBM competition, although TOM Co would be happy to have ASI continue to purchase its equipment. Although warned that ASI would sue for patent infringement and use of confidential information, TOM, beginning late in April, 1956, began to promote its own equipment by direct mail and trade journal advertising. On July 13, 1956, ASI wrote sign supply houses charging TOM with infringement, although, as yet, ASI did not know the construction of TOM's equipment.

TOM brought suit for declaratory judgment, as indicated, on or about August 17, 1956, and ASI filed suit on or about October 31, 1956. In November, 1956, at a convention in Los Angeles, California, ASI distributed card notifications of its patent and pending litigation, and in early 1958, wrote many banks and loan associations respecting its patent. There was no assertion by ASI or Williams Brothers, Inc. of any exclusive agreement with TOM Co (or breach thereof) not to sell TOM equipment to others.

ASI was leasing its signs, containing TOM equipment, to various banks on exclusive territory bases. The District Court did not determine the validity of such lease provisions, nor was it required to do so. The evidence did not disclose that TOM Co or TOM were informed of the terms of these leases, the identity or location of the lessees. They were not parties directly or indirectly and were not bound by the leases.

The District Court's finding of fact No. 45 describes the equipment at the Spokane and Eastern Bank, installed in December 1951, by Williams Brothers, Inc. in accordance with TOM Co's wiring diagrams and instructions, and containing control equipment engineered and developed by TOM Co as follows:

"(a) It included a lamp bank which was fabricated by Williams Brothers, Inc. in accordance with instructions from TOM Co. and in accordance with lamp layouts which had been used by TOM Co. since at least 1948.

"(b) It also included a numeral clock which was essentially like the numeral clock which TOM Co. had been making and selling since March 1949. The numeral clock included a synchronous motor which closed a switch each minute for operating a run back motor, which in turn continuously operated cams in steps for opening and closing spring closed contacts which were connected to the lamp bank for displaying time in hours, ten minutes and minutes.

"(c) It further included a numeral thermometer control mechanism which was essentially like the numeral thermometer control mechanism which TOM Co. had been making and selling since May 4, 1951, and it included three units, a thermometer amplifier controller and two numeral controls. The thermometer amplifier controller sensed temperature conditions through an amplifier and continuously operated a reversible motor, which continuously operated cams for opening and closing spring closed contacts. Each numeral control included a continuously operable single direction motor which was controlled by the control contacts of the thermometer and amplifier controller to continuously operate cams in steps for opening and closing spring closed contacts which were connected to the lamp bank for displaying temperature in tens of degrees and degrees.

"(d) In addition, the numeral controls and the numeral clock contained lift mechanisms which were essentially like the lift mechanisms which TOM Co. had been making and selling since 1948 and 1949. The base of the numeral controls and the numeral clock were made

about three inches wider than usual to accommodate the lift mechanisms, and contacts with tails, which had been used on TOM Co.'s flashers, were substituted for the usual contacts so that the lifter bars of the lift mechanisms could engage beneath the tails to lift all of the contacts at one time. The purpose of all of these lift mechanisms was to simultaneously lift all of the cam actuated spring closed contacts at one time to simultaneously open all of the circuits through such contacts. The solenoids of the lift mechanisms were energized to open the contacts and they were controlled by a flasher operating on a five second timing cycle. The lift mechanisms of the numeral controls were also controlled by the relays which controlled the single direction motors of the numeral controls. The lift mechanisms of the numeral clock were also controlled by a relay which was operated by the synchronous motor operated switch which controlled the run back motor.

"(e) The flasher alternately energized the solenoids of the lift mechanisms of the thermometer numeral controls and the numeral clock to open the contacts of the numeral controls for disconnecting the numeral thermometer control mechanism from the lamp bank to display time, and to open the contacts of the numeral clock for disconnecting the numeral clock from the lamp bank to display temperature. In other words, the flasher and lift mechanisms operated to alternately disconnect the numeral thermometer control mechanism and the numeral clock from the lamp bank to display time and temperature, respectively, alternately. Whenever a time change occurred, the continuously operable numeral clock, which continuously operated its cams, was disconnected by its lift mechanisms from the lamp bank and, if time was then being displayed, the lamp bank was blacked out. Likewise, when a temperature change occurred, the continuously operable numeral thermometer control mechanism, which continuously operated its cams, was disconnected by its lift mechanisms from the lamp bank, and, if this occurred while temperature was being displayed, the lamp bank was blacked out."

The draftsman employed by Greek Wells made up the drawings for the patent application from the above described Spokane and Eastern Bank sign and the patent entitled "Display Sign," represents and discloses that installation in construction, manner of operation, and results.

As indicated by the patent itself and the testimony of Greek Wells, the patent is not based on the general design or idea of alternate display of time and temperature on a single bank of lamps, but is limited to use of the particular control equipment described and claimed to produce the end result.

■ A study of the prior art presented at the trial, (more like the patent than that cited by the Patent Examiner, who did not see and consider TOM Co's prior control equipment,) [2] shows that lamp banks in a display sign (including equipment for illuminating different characters), circuit controlling devices for connecting and disconnecting current supply to a single bank of lamps, time and temperature controlled control devices to energize appropriate lamps in the bank, and rocker bars beneath a group of spring closed cam operated contacts to lift all of the group of contacts together, were all old in the art in structure, function and results produced. The functions performed by the assembly of those elements were merely the sum total of the old function of the individual elements with no unusual or unexpected result. This was not patentable invention. Great Atlan-

2. Thus greatly weakening the presumption of validity. Johnson Laboratories, Inc. v. Meissner Mfg. Co., 7 Cir., 1938, 98 F.2d 937, 943.

tic and Pacific Tea Co. v. Supermarket Equipment Corp., 1950, 340 U.S. 147, 151, 71 S.Ct. 127, 95 L.Ed. 162.

The design of the sign had been made open for public inspection by the copyright registration more than one year prior to filing the patent application. 35 U.S.C.A. § 102(b). The claimed subject matter of the patent would have been obvious to one having ordinary skill in the art. Otis v. National Tea Co., 7 Cir., 1955, 218 F.2d 153.

The record shows the findings of fact of the Court below not to be clearly erroneous. We agree with the District Court's conclusions that the patent is invalid in view of the prior art, because the claimed subject matter was obvious at the time of alleged invention to one ordinarily skilled in the art to which the claimed subject matter pertained, and because the Williams brothers did not themselves invent the subject matter. ASI argues that the District Court misapplied the rule of Agawam Woolen Co. v. Jordan, 1868, 74 U.S. 583, 602, 19 L. Ed. 177. That case is easily distinguished. Goulding, plaintiff's assignor, had discovered an improved principle in a machine. The fact that he employed others to assist him in carrying out that principle and adopted some of their suggested improvements was held not to bar his securing a valid patent as sole inventor. Here, however, the idea of displaying alternately illuminated characters was old in the art.

It further appears that the District Court was fully justified in finding that ASI, as owner of a patent it believed to be valid, was acting in good faith in issuing notices of alleged infringement and was not guilty of unfair competition.

This Court also agrees that there was no contract or agreement, express or implied, whereby TOM or TOM Co agreed not to sell its control equipment other than to Williams Brothers, Inc. or ASI, nor was there a confidential relationship between them.

Affirmed.

