GENERAL RADIO COMPANY,
Defendant, Appellant,

v.

The SUPERIOR ELECTRIC COMPANY,
Plaintiff, Appellee.

No. 14077.

United States Court of Appeals
Third Circuit.

Argued Jan. 22, 1963.

Decided Aug. 23, 1963.

Rehearing Denied En Banc
Oct. 23, 1963.

858

Robert H. Rines, Rines & Rines, Boston, Mass. (Harry B. Rook, Newark, N. J., David Rines, Boston, Mass., on the brief), for appellant.

Frank L. Bate, Newark, N. J., Stephen H. Philbin, Fish, Richardson & Neave, New York City (Shanley & Fisher, Newark, N. J., Ernest M. Junkins, Bridgeport, Conn., on the brief), for appellee.

William F. SMITH, Circuit Judge.

Before STALEY and SMITH, Circuit Judges, and SHAW, District Judge.

SMITH, Circuit Judge.

The plaintiff, having been notified that an article of its manufacture infringed a patent owned by the defendant, brought this action under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, seeking an adjudication of the controversy. The defendant filed an answer and counterclaim charging the plaintiff with patent infringement and unfair competition. The plaintiff filed a reply in which it pleaded the usual defenses. The present appeal is from a judgment in favor of the plaintiff on the issues of patent validity and unfair competition.[1]

## PATENT VALIDITY

The defendant is admittedly the owner of Patent No. 2,949,592, which issued on the application of one Gilbert Smiley. The patent covers an article of manufacture therein described as an "adjustable autotransformer" which, like the ordinary transformer, is used to control current and voltage in alternating current electric circuits. The autotransformer is placed across the supply circuit and is so disposed between it and the load circuit as to permit the adjustment of current and voltage, either upwardly or downwardly, to the requirements of the load circuit. It differs from the ordinary transformer in that one of the windings is connected in series with the other, thereby forming the equivalent of a single winding.

1. The trial court's findings of fact and conclusions of law are set forth in a comprehensive and well-reasoned opinion reported in 203 F.Supp., at page 864.

The patent contains a single claim which describes the alleged invention as follows:

"A variable-impedance auto-transformer having, in combination, a copper-wire single-layer substantially toroidal winding wound in successively disposed turns about an annular core *to provide along the exterior of the winding a track extending across the successively disposed turns, there being bonded to the turns along the track coatings selected from the group consisting of gold, platinum, palladium, rhodium, silver and nickel,* means for connecting the winding to a source of voltage, the winding being adapted to be connected also with a load circuit to exchange current with the load circuit at values not greater than a predetermined safe value above which the winding would become damaged by such exchange of current, and a *carboniferous or graphitic resistive brush actuable along the track in contact with the coatings and adapted for connection with the load circuit, the width of the brush being greater than the distance between two successive turns of the winding in order that the brush may establish contact with the coating bonded to a turn before breaking contact with the coating bonded to the adjacently disposed turn with which it last contacted,* thereby to prevent interruption of the current in the load circuit into the brush, means for connecting a point of the winding and the brush to the load circuit, and *the brush being rotatable about the axis of the toroidal winding along the said track in engagement with the coatings of the successively disposed turns,* the coatings maintaining the resistance between the brush and the track, during passage of the current of the predetermined safe value between them, substantially constant." (Emphasis added).

The alleged invention is essentially an improvement on the invention described in Patent No. 2,009,013, granted to Eduard Karplus and William Tuttle, to which specific reference is made in the patent in suit. This patent had expired at the time this action was brought.

The alleged invention is comprised of the following structural elements: (a) an impedance or choke coil consisting of insulated copper wire toroidally wound in successively disposed turns about an annular core or iron or laminated steel, the adjacent turns being sufficiently spaced to prevent contact with each other; (b) a circumferential commutator track produced by removing the insulation from the adjacent turns of the coil so as to permit brush-to-track contact at successive radial positions around the track; (c) a coating made of an alloy of any one of several oxidation-resistant metals such as silver, gold, platinum, rhodium and nickel, bonded to the exposed turns of the track; (d) a "carbon brush," [2] wider than the space between the adjacent turns, rotatably mounted on an axial shaft and so disposed in relation to the commutator track as to permit brush-to-track contact at successive radial positions.

 The claim to patentable invention necessarily rests, as the defendant concedes, on the utilization of an oxidation-resistant coating on the exposed turns of the winding as a means to prevent the formation of cupric oxide which adversely affects the stability of brush-to-track resistance essential to the efficient operation of the autotransformer. Except for this feature, the patent in suit covers nothing more than an assemblage of structural elements, fully described in the patent to Karplus and Tuttle, in an autotransformer in which they perform no functions different from those there-

---

2. The "carbon brush," known in the art long prior to the patent in suit, is made of a composition in which carbon, in one or another of its allotropic forms, is a constituent. The "carbon brush" is employed in autotransformers because of its low resistance to the flow of useable current and its high resistance to stress resulting from short circuit voltage.

tofore performed in earlier devices. The patent in suit must therefore be scrutinized "with a care proportioned to the difficulty and improbability of finding invention" in such an assemblage. Great Atlantic & Pacific Tea Company v. Supermarket Corp., 340 U.S. 147, 71 S.Ct. 127, 95 L.Ed. 162 (1950). The claim to invention must be appraised here in the light of the prior art considered in its entirety. Ibid.

The British patent to Sedgfield, issued on March 22, 1949, more than two years prior to the application for the patent in suit, relates to an improved potentiometer. This is an instrument for measuring galvanometrically electromotive force, the force which causes the movement of current through a conductor. While the potentiometer differs from the autotransformer in function and operation, it is comprised of structural elements similar to those of the autotransformer, to wit, (a) an impedance coil of low resistance wire made of an alloy of nickel, platinum, gold or silver, known to be resistant to oxidation; (b) a commutator track produced by removing the insulation from the adjacent turns of the coil so as to permit wiper-to-track contact; (c) a "wire wiper," known in the art, made of wire of suitable conductivity and so disposed with relation to the track as to permit contact. It is essential to the operation of the instrument that the wiper-to-track resistance be stabilized at a low level.

It was apparently known prior to Sedgfield that the sensitivity of the potentiometer, and consequently its accuracy, was adversely affected by the formation of tarnish on the commutator track.[3] Sedgfield discovered and recommended that this condition could be prevented by electroplating the exposed turns of the impedance coil with an alloy of rhodium, an element of the platinum group. The significance of his patent lies in its disclosure that metals susceptible to tarnish formation, when exposed to deleterious atmospheric conditions, could be protected against such formation by coating them with another metal resistant to such conditions. It would have been obvious to a skilled mechanic, having a knowledge of the disclosure and a basic knowledge of the properties of metals, that a copper surface could be similarly protected against oxidation by the application of a coating of any one of several suitable metals.

An apposite reference is Hunt, "Electrical Contacts," a textbook published in May of 1946, from which the following quotations were taken:

"Copper, * * * cannot be regarded as suitable material[s] for contacts in applications *where a low contact resistance is required.* Even at room temperature a sufficiently thick film forms on copper in a few hours *to increase the contact resistance* many times as compared with that obtained with chemically clean contacts. (p. 17).

"Film formation will cause *increased contact resistance, and can lead to a vicious spiral of increasing temperature rise and increasing film formation.* In this connection therefore the relative tendency of each material *to form oxide,* sulphide or other films under varying conditions should be appreciated. (p. 73).

"Copper, which is widely used, has the advantage of possessing high thermal conductivity and high specific heat, but has *serious limitations in another respect which make it unsuitable for contactor contacts as conditions increase in severity.* It is liable to severe over-heating *owing to the formation of a high-resistance oxide film, a vicious circle being set up as the temperature rises, causing further oxidation and still greater rise of temperature.* Such over-heating leads to increased electrical wear and to welding of the contacts.

3. The noble metals such as gold, silver, etc., although highly resistant to oxidation, are susceptible to the formation of tarnish, a thin film of the metallic sulfide, when exposed to certain atmospheric conditions.

*Even on light duties, however, it will be found that silver shows a considerable advantage over copper*, particularly where operation is not frequent, and the long idle periods give rise to films of copper oxide. (p. 50).

"Overheating of the contacts can be prevented almost entirely by the use of fine silver. The usual procedure is to insert *a facing of silver*, of the order of one-sixteenth inch in thickness, *into the copper contact by silver brazing*, the size of facing depending upon the area over which contact is made." (p. 51). (Emphasis added).

Hunt also teaches that the copper contact may be faced or coated also with either platinum or rhodium, which are highly resistant to both oxidation and tarnish; in fact, platinum is immune to oxidation and rhodium oxidizes only at very high temperatures. See also Wise, "Electrical Contacts."

When the Hunt disclosures are considered with reference to the common knowledge of the art, their relevant significance becomes apparent. It was known that in the operation of the autotransformer the brush-to-track resistance produced heat. It was also known that when exposed to atmospheric conditions and under moderate temperatures, copper is susceptible to the formation of cuprous oxide, a low-resistance oxide which increased the brush-to-track resistance. It was likewise known that when exposed to atmospheric conditions and under higher temperatures, cuprous oxide, although comparatively stable, was converted to cupric oxide, a high-resistance oxide which further increased the brush-to-track resistance. This phenomenon was recognized by Hunt and Wise, who taught that the formation of copper oxide on the contact surface, and the resulting operational difficulties, could be prevented by coating the copper with silver, platinum or rhodium, metals known to be resistant to oxidation.

The trial court found, on the basis of the references hereinabove discussed, and other evidence, that the subject matter of the patent in suit would have been obvious at the time of the alleged invention to a person possessed of the ordinary knowledge and skill of the art, and was therefore not patentable. 35 U.S.C. § 103. This finding, with which we are in full accord, is challenged by the defendant as clearly erroneous.

The alleged invention of the patent in suit was directed to the solution of a problem explained by Smiley as follows:

"The transformer is initially designed to provide a satisfactory *brush-to-track resistance* within * * * resistance limits. It has been found, however, that when the apparatus is in continuous use, particularly at elevated temperatures and in regions where industrial vapors or other corrosive influences are present, *the copper track detrimentally oxidizes, contaminates and corrodes, markedly and rapidly increasing, and thus rendering unstable, the resistance of the brush-to-copper track interface.* With long periods of continuous use, indeed, a *progressively destructive cycle* is often initiated in which the increasing oxidation, contamination and *corrosion of the track during the use of the instrument increases the brush-to-track resistance, which, in turn, further increases the temperature at the contact between the brush and track,* which still further *increase the oxidation,* contamination and corrosion, until *failure or improper operation of the instrument results from the high temperature."* (Emphasis added).

This was substantially the explanation offered by Hunt. The only difference is found in the descriptive language employed.

The defendant argues that Smiley was the first to discover that the operational difficulties inherent in the autotransformer were attributable to the formation of cupric oxide, identified by Hunt as "high-resistance oxide," and not to other suspected causes. The argument is refuted by a substantial evidence to the contrary and fails to accord the Hunt and Wise

disclosures their full and proper significance. However, assuming that Smiley was the first to discover the cause of the operational difficulties, the present claim to patentable invention is not thereby enhanced.

The defendant concedes that prior to the application for the patent in suit it was common knowledge that the formation of low-resistance oxide could be prevented by applying a coating of silver, or other suitable metal, to the commutator track. However, the defendant argues that Smiley's invention is distinguishable in that therein the silver coating is utilized as a means to prevent the formation of high-resistance oxide. This is a hypercritical distinction without a difference.

▉▉▉▉ There is no feature which distinguishes the coated track defined by Smiley from that described by both Hunt and Wise except the function ascribed to it by the defendant. This functional feature neither enhances the claim to patentable invention nor detracts from the pertinency of the prior art. General Electric Co. v. Jewel Incandescent Lamp Co., 326 U.S. 242, 66 S.Ct. 81, 90 L.Ed. 43 (1945); DeForest Radio Co. v. General Electric Co., 283 U.S. 664, 51 S.Ct. 563, 75 L.Ed. 1339 (1931); Risdon Iron & Locomotive Works v. Medart, 158 U.S. 68, 15 S.Ct. 745, 39 L.Ed. 899 (1895); American Sign & Indicator Corp. v. Schulenburg, 267 F.2d 388 (7th Cir., 1959), cert. den. 361 U.S. 886, 80 S.Ct. 157, 4 L.Ed.2d 121 (1959); Application of Lawson, 228 F.2d 249 (C.C.P.A., 1955). It has been recognized since Knapp v. Morss, 150 U.S. 221, 14 S.Ct. 81, 37 L.Ed. 1059, decided in 1893, that patentable invention consists in the embodiment of new and useful means to achieve a desired result and not in the functions attributed to the means. Where, as here, the allegedly novel feature of the claimed invention is a structural element substantially similar to one of the prior art, even though its function may be different, the similarity is sufficient to negative patentability. Ibid.

▉▉▉ Once it was known that the copper track could be protected against oxidation by the application of a coating of silver, or other suitable metal, it would have been obvious to the skilled artisan that the same coating would prevent the formation of both the low-resistance and high-resistance oxides. This is unmistakably the teaching of Hunt, although the defendant disputes it. We are of the view that Smiley contributed nothing to the advance of the art. Assuming that he did, his contribution consisted of nothing more than the application of known means to an analogous use in the same art. This is not invention even though the use was not theretofore contemplated. General Electric Co. v. Jewel, etc., Co., supra; Cuno Engineering Corp. v. Automatic Devices Corp., 314 U.S. 84, 62 S.Ct. 37, 86 L.Ed. 58 (1941); Vandenburgh v. Truscon Co., 261 U.S. 6, 43 S.Ct. 331, 67 L.Ed. 507 (1923); B. & M. Corp. v. Koolvent Aluminum Awning Corp., 257 F.2d 264 (7th Cir., 1958); United Mattress Mach. Co. v. Handy Button Mach. Co., 207 F.2d 1 (3rd Cir., 1953); R. G. Le Tourneau, Inc. v. Gar Wood Industries, 151 F.2d 432 (9th Cir., 1945), cert. den. 327 U.S. 782, 66 S.Ct. 683, 90 L.Ed. 1010 (1945). Such applications are regarded as involving nothing more than expected mechanical skill. Ibid.

The trial court found the patent invalid also on the ground that the alleged invention was known and used by others long prior to Smiley's application for the patent in suit, which was filed in April of 1951. 35 U.S.C. § 102. It found that one Alfred B. Nelson, a former employee of the defendant and president of the plaintiff since 1946, first, conceived the alleged invention; second, reduced it to practice in 1941; and third, thereafter "proceeded to silverplate its commutator tracks, and to sell these plated * * * transformers to customers, * * *." The evidence upon which these findings were predicated is fully summarized in the opinion of the court, 203 F.Supp., at pages 872–874. Any further summarization would be unnecessarily repetitious.

■ The defendant challenges the pertinent findings as clearly erroneous. It is argued that there is no evidence "of which defendant is aware that in any way supports these facts, except for innuendos to be drawn from several oral, unsupported and uncorroborated statements of Mr. Nelson, given over twenty years after the supposed event and directly contradictory of the documentary evidence and the conduct of the plaintiff." We concede that if the findings rested solely on the testimony of Nelson, there would be a serious question as to the sufficiency of the evidence. Smith v. Hall, 301 U.S. 216, 222, 57 S.Ct. 711, 81 L.Ed. 1049 (1937); Anderson Company v. Trico Products Corporation, 267 F.2d 700 (2d Cir., 1959). However, we find upon examination of the entire record that the findings are supported by substantial evidence. While it appears that Nelson was the principal witness, it also appears that his testimony was amply corroborated by testimonial and documentary evidence which the trial court apparently found to be credible. The findings of fact must therefore be accepted by this Court. Fed.Rules Civ.Proc., Rule 52(a), 28 U.S.C.A.; Jiffy Enterprises, Inc. v. Sears, Roebuck & Co., 306 F.2d 240 (3rd Cir., 1962); cert. den. 371 U.S. 922, 83 S.Ct. 289, 9 L.Ed.2d 230 (1962); R. M. Palmer Company v. Luden's, Inc., 236 F.2d 496 (3rd Cir., 1956).

## UNFAIR COMPETITION

The parties to this litigation are admittedly competitors engaged in the manufacture and sale of autotransformers. The product of the defendant is sold under the registered trade name "VARIAC," and that of the plaintiff is sold under the registered trade name "POWERSTAT." However, the claim of unfair competition does not involve trade name infringement.

The autotransformer of the defendant is enclosed in a six-sided steel housing of simple design, which the defendant here asserts has acquired a secondary meaning. The structure is adequately and clearly described in the opinion of the court below. The claim for unfair compe-tition is predicated solely on the charge that the plaintiff's autotransformer is enclosed in a housing which, in style and general appearance, is confusingly similar to the defendant's housing. There is no evidence that the plaintiff either misrepresented the source of its products or palmed them off as those of the defendant.

■■ The burden was upon the defendant to prove by a preponderance of evidence that: first, its housing was so distinctive in design and general appearance as to identify the source of the enclosed autotransformer; second, purchasers were moved to buy the product because of its source; and third, the secondary meaning had been established when the plaintiff adopted the allegedly similar housing. Sylvania Electric Products v. Dura Electric Lamp Company, 247 F.2d 730, 733 (3rd Cir., 1957); Lucien Lelong, Inc. v. Lander Co., 164 F.2d 395, 397 (2nd Cir., 1947); Gum v. Gumakers of America, 136 F.2d 957, 959 (3rd Cir., 1943); American Fork & Hoe Co. v. Stampit Corporation, 125 F.2d 472, 475 (6th Cir., 1942); Crescent Tool Co. v. Kilborn & Bishop Co., 247 F. 299, 300 (2nd Cir., 1917). The burden was upon the defendant to show that the primary significance of its housing in the minds of the prospective purchasers was not the product but the manufacturer. Kellogg Co. v. National Biscuit Co., 305 U.S. 111, 118, 59 S.Ct. 109, 83 L.Ed. 73 (1938). The trial judge, applying these established principles, concluded that the defendant had failed to sustain the burden of proof. We are in accord with this conclusion.

The trial judge found affirmatively that the imitated features of the defendant's housing were functional. The defendant now argues that the finding was limited to certain features which the trial judge emphasized in his opinion. We cannot agree with this narrow construction; it clearly appears from the trial court's opinion that every element of the defendant's structure was considered. However, assuming the narrow construction to be correct, we consider those features

of the plaintiff's housing which the defendant now urges were nonfunctional and the use of which should have been enjoined.

 The defendant's brief points to seven structural elements of the plaintiff's housing as nonfunctional. After an examination of the testimony, the photographs and physical exhibits, we are convinced that these elements were functional in that they contributed to the utility and efficiency of the housing and its general appearance. However, even assuming that these features were nonfunctional, the claim of secondary meaning cannot be upheld. The burden was upon the defendant to prove that it was ondary meaning was derived. Crescent from these features that the claimed secondary meaning was derived. Crescent Tool Co. v. Kilborn & Bishop Co., supra. The burden was not sustained.

 However, assuming that the defendant's housing had acquired a secondary meaning, as here contended, but that its imitated elements were functional, as the trial court correctly found, the defendant was not entitled to prevail. Absent proof of misrepresentation or palming off, the essence of unfair competition is the probability of consumer confusion. Surgical Supply Service, Inc. v. Adler, 321 F.2d 536 (3rd Cir., 1963); Flintkote Co. v. Tizer, 266 F.2d 849, 852 (3rd Cir., 1959); Lucien Lelong, Inc. v. Lander Co., supra. If the imitated features of an article of manufacture are functional but have also acquired a secondary meaning, the imitator may be required to take reasonable precautions to protect prospective purchasers against the probability of deception as to the source of the product. Sylvania Electric Products v. Dura Electric Lamp Co., supra, 247 F.2d at page 734; Restatement of the Law, Torts, § 741(j). Such precautions had been taken by the plaintiff before this action was brought.

 The face of the defendant's housing bears a plate on which there prominently appears the name "VARIAC," accompanied by a stylized letter "R," disposed within a circle immediately to the right of that name. The name and address of the defendant also appear on the plate. The top surface of the plaintiff's housing bears a plate on which there prominently appears, in red letters, the name "POWERSTAT." The name and

address of the plaintiff also appear on the plate. The similarities in the housings are solely in their functional features, and to these the defendant may not claim a right to exclusive use. See the cases hereinabove cited. We might add that there is nothing in the general appearance of the plaintiff's housing that would mislead even the most casual purchaser as to the source of the product.

The judgment of the District Court will be affirmed.

## ORDER

Before BIGGS, Chief Judge, McLAUGHLIN, KALODNER, STALEY, HASTIE, GANEY and SMITH, Circuit Judges, and SHAW, District Judge.

PER CURIAM.

The petition for clarification, rehearing and reconsideration by the court en banc, filed by defendant-appellant in the above-entitled case having been submitted to the judges who participated in the decision of this court and to all the other available circuit judges of the circuit in regular active service, and no judge who concurred in the decision having asked for rehearing, and a majority of the circuit judges of the circuit in regular active service not having voted for rehearing by the court en banc, the petition for rehearing is denied.